No. 22-15010

In the United States Court of Appeals

for the Ninth Circuit

_____

Najarian Holdings LLC and Najarian Capital LLC,

Plaintiffs-Appellants

v.

CoreVest American Finance Lender LLC,

Defendant-Appellee.

_____

On Appeal from the United States District Court for the

Northern District of California, Oakland Division

_____

Opening Brief of Appellants

_____

JEFF REICH
THE REICH LAW FIRM
8441 N. MILLBROOK, SUITE 104
FRESNO, CA 93720
TELEPHONE: (559) 440-1191

KANE ST. JOHN
ST. JOHN LAW FIRM, LLC
2164 PAWNEE DRIVE
MARIETTA, GA 30067
TELEPHONE: (678) 492-7637

ATTORNEYS FOR APPELLANTS

# CORPORATE DISCLOSURE STATEMENT

Counsel for Appellants/Plaintiffs certifies the following:

1.      The full name of every party represented by me is: Najarian Holdings LLC and Najarian Capital LLC.

2.      The names of the real parties in interest (if the parties named in the caption are not the real parties in interest) represented by me are: Najarian Holdings LLC and Najarian Capital LLC.

3.      The parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties or amicus curiae represented by me are: none.

4.      The names of all law firms and other partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Jeff Reich

Kane St. John


Dated: May 11, 2022


Respectfully submitted,

The Reich Law Firm


By: ____s/ Jeff Reich_____


Attorneys for Appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES     5

STATEMENT OF JURISDICTION     **7**

STATEMENT OF ISSUES PRESENTED FOR REVIEW     8

STATEMENT REGARDING ORAL ARGUMENT     9

STATEMENT OF THE CASE     9

SUMMARY OF THE ARGUMENT     10

*Summary of Plaintiffs' Argument that the
Late Fees Charged by CAF Were Illegal
Penalties Rather than Enforceable Liquidated Damages*     10

*Summary of Plaintiffs' Argument that The Release Did Not
Effect a Release of the Claims Brought in this Proceeding*     11

*Summary of Plaintiffs' Argument that Release Fees
Were Not Authorized by the Parties' Agreements*     12

STANDARDS OF REVIEW     12

ARGUMENT     13

I   **The Late Fees Charged by CAF Were Illegal Penalties.**     13

  A  There Was No Endeavor—Reasonable or Otherwise—To
Approximate Losses Caused by Late Payments.     15

  B  CoreVest's Post-Hoc Rationalizations Must Be Rejected.     18

  C  Plaintiffs Were Not Obliged to Proffer Evidence
in Response to CoreVest's Post-Hoc Rationalizations.     20

  D  The Late Fees at Issue Fail the "Reasonable
Relationship" Test as a Matter of Law.     22

E  Monetary Relief Is Available under Section 1671, Cal. Civ.
Code, to Compensate Plaintiffs for the Illegal Penalties They Paid.    25

F  Plaintiffs Are Entitled to Partial Summary Judgment
on their Claims that the Late Fees Were Illegal Penalties.    25

**II  The Release Does Not Affect Any of the Plaintiffs' Claims.**    26

A  The Release Is Not Enforceable
Because It Was Not Signed by CAF.    27

    *1.  The First Amendment Is, by Its Terms,
Ineffective Because CAF Failed to Sign It.*    27

    *2.  The First Amendment Is Not Valid Pursuant to
the Integration Clause of the Loan Agreements.*    28

    *3.  The First Amendment Is Unenforceable
Pursuant to the Parol Evidence Rule.*    28

B  Neither NH nor NC Released
Claims for Future Breaches of Contract.    30

C  NC Did Not Release Any of Its Claims.    33

    *1  The Release, by its terms, Excludes
Claims that Were Owned by NC.*    33

    *2  NC Did Not Receive Any
Consideration for the Purported Release.*    33

    *3  NC Was Not an Affiliate of the "Loan Parties"
within the Meaning of the First Amendment.*    34

D  The Release Was Ineffective to Release Past or
Future Claims that the Late Fees Were Illegal Penalties.    35

**III The Plaintiffs Are Entitled to Partial Summary**

**Judgment on their Claims that the Release Fees Were**
**Not Authorized and Constitute Breaches of the Agreements.**                37

  A  The Release Fees Were Not:
        (i) Described in the "Loan Documents";
        (ii)"Incurred by Lender"; or
        (iii)"Costs and Expenses of Lender."                37

  B  The Release Fees Are Not *Eiusdem Generis* with the
     Closing Costs Described in Section 3.3 of the Note.                42

  C  The Loan Documents Describe a Fair and
     Sound Regime for Reimbursement of Costs.                44

  D  The High Cost of the Release Fees Is Not a
     Basis of the Plaintiffs' Claims,and Cannot Be
     a Basis for Affirming Judgment Against Plaintiffs.                47

  E  The Release Fees Were Not "Pass-Through" Charges.                48

IV **CONCLUSION**                48

Certificate of Compliance (Word Count, Form 8)                52

Statement of Related Cases (Form 17)                53

## TABLE OF AUTHORITIES

C̲A̲S̲E̲S̲

*Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002)------------------------------12

*Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 617 (9th Cir.2003) ----------------51

*Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) --------------------------13

*Beasley v. Wells Fargo Bank*, 1 Cal.Rptr.2d 446, 235 Cal.App.3d 1383 (Cal. App.
   1991) ------------------------------------------------------------------------------------25

*Garrett v. Coast & Southern Fed. Sav. & Loan Assn* -------------------- 14, 17, 23, 25

*Graylee v. Castro*, 52 Cal.App.5th 1107, 265 Cal.Rptr.3d 885 (Cal. App. 2020) -35

*Greentree Financial Group, Inc. v. Execute Sports, Inc*., 163 Cal.App.4th 495, 78 Cal.Rptr.3d 24 (Cal. App. 2008) ---------------------------------------------------------24

*Guatay Christian Fellowship v. County of San Diego*, 670 F.3d 957, 970 (9th Cir. 2011) -------------------------------------------------------------------------------12

*Hardwick v. Wilcox*, 11 Cal.App.5th 975, 217 Cal.Rptr.3d 883 (Cal. App. 2017)-36

*Hesse v. Sprint Corp*., 598 F.3d 581 (9th Cir. 2010)----------------------------------32

*Hitz v. First Interstate Bank*, 44 CalRptr.2d 890, 38 Cal.App.4th 274 (Cal.App.1995) -----------------------------------------------------------------------19

*In re Cellphone Termination Fee*, 193 Cal.App.4th 298, 326, 122 Cal.Rptr.3d 726, 750 (Cal. App. 2011) --------------------------------------------------------------------22

*Irwin v. Mascott*, 96 F.Supp.2d 968 (N.D. Cal. 1999) ---------------------------------19

*Leaf v. City of San Mateo*, 104 Cal.App.3d 398, 163 Cal.Rptr. 711 (Cal. App. 1980) ------------------------------------------------------------------------------------37

*Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 373-74 (9th Cir.1996) -----------51

*Purcell v. Schweitzer*, 224 Cal. App. 4th 969, 975 (2014) ----------------------------36

*Ridgley v. Topa Thrift and Loan Ass'n*, 73 Cal.Rptr 2d 378, 17 Cal. 4th 970, 953 P.2d 484 (Cal. 1998)--------------------------------------------------------- 14, 16, 17, 23

*Secrest v. Security National Mortgage Loan Trust 2002-2*, 167 Cal.App.4th 544, 547-548, 84 Cal. Rptr. 3d 275 (Cal. App. 2008)------------------------------------29

*Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021) --------------------12

*Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003) ------------------------------------------------------------------------------------------12

*Timney v. Lin*, 106 Cal.App.4th 1121 1127, 131 Cal.Rptr.2d 387 (2003) ----------35

*Travelers Prop. Cas. Co. of Am. v. ConocoPhillips* Co., 546 F.3d 1142, 1145 (9th Cir. 2008)------------------------------------------------------------------------------------12

*U.S. v. 4,432 Mastercases of Cigarettes*, 448 F.3d 1168 (9th Cir. 2006) -----------50

*Util. Consumers' Action Network, Inc. v. AT & T Broadband of S. Cal., Inc.*, 135 Cal. App. 4th 1023 1035, 37 Cal.Rptr.3d 827 (2006) -------------------------------21

*Vitatech International, Inc. v. Sporn*, 16 Cal.App.5th at p. 807, 131 Cal.Rptr.2d 387 (2017)--------------------------------------------------------------------------------36

*Weddington Productions v. Flick*, 60 Cal.App.4th 793, 811 (1998) -----------------34

*Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir.2008) -----------------------32

## STATUTES

Cal. Civ. Code §1671---------------------------------------------------------------- 9, 19, 25

Cal. Civ. Code §1671(b) ------------------------------------------------------------14, 16, 22

Cal. Civ. Code §3275--------------------------------------------------------------------- 9

Cal. Civ. Code § 1550--------------------------------------------------------------------34

## TREATISES

1 Witkin, Summary of Cal. Law, Contracts, § 3, p. 61 --------------------------------34

## STATEMENT OF JURISDICTION

The District Court exercised diversity jurisdiction, pursuant to 28 U.S.C. § 1332. The Plaintiffs are entities that are registered and have their principal places of business in Georgia. Defendant is organized under the laws of Delaware. The amount in controversy, exclusive of interest, punitive damages and attorneys' fees, is in excess of $120,000.00.

The District Court entered its order granting CoreVest's motion for summary judgment on all claims and denying Plaintiffs' motion for partial

summary judgment as to liability on all claims on December 2, 2021. 1-ER-5–18.

Judgment, was entered the same day, disposing of all parties' claims except

Defendant's claim for attorneys' fees. 2-ER-4. The Plaintiffs timely filed their

notice of appeal on December 30, 2021. 7-ER-1315. On January 28, 2022, the

District Court granted Defendant's motion for attorneys' fees. 1-ER-2–3. That

order was the subject of the Plaintiffs' Amended Notice of Appeal, timely filed on

February 25, 2022. 7-ER-1314.

This Court has jurisdiction to determine this appeal pursuant to 28 U.S.C. §

1291.

STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.a.   Did CoreVest demonstrate as a matter of law that the late fees that CAF

charged the Plaintiffs were not illegal penalties and that Plaintiff may not recover?

1.b.   Did Plaintiffs demonstrate as a matter of law that the late fees that CAF

charged the Plaintiffs were illegal penalties that Plaintiffs may recover?

2.a.   Did CoreVest demonstrate as a matter of law that the Release Fees were

authorized fees under the Loan Agreements that the Plaintiffs may not recover?

2.b.   Did Plaintiffs demonstrate as a matter of law that the Release Fees were

unauthorized fees under the Loan Agreements that the Plaintiffs may recover?

3.a.   Did CoreVest demonstrate as a matter of law that the partially executed First

Amendment released the claims asserted in this proceeding by both Plaintiffs?

3.b.    Did Plaintiffs demonstrate as a matter of law that the partially executed First Amendment did not release the claims asserted in this proceeding by Plaintiffs?

STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a), Appellants request oral argument.  Appellants believe that explication of the issues will be aided by oral argument.

STATEMENT OF THE CASE

CAF Lending, LLC ("CAF") loaned money to the Plaintiffs, Najarian Capital LLC ("Najarian Capital" or "NC") and Najarian Holdings LLC ("Najarian Holdings" or "NH"), to purchase or finance parcels of real property.  In the course of their relationships, which encompassed short-term loans secured by over eight hundred homes in Georgia, CAF charged the Plaintiffs two types of fees that it ought not to have charged: late fees and "Release Fees."  The late fees were illegal penalties, pursuant to California Civil Code Sections 1671 and 3275.  A "Release Fee" of $250 was collected by CAF's loan Servicer, Cohen Financial ("Cohen"), when each parcel subject to a security deed granted to CAF was to be released from that security deed because the parcel at issue was sold to a third party or refinanced by a different lender.  The Release Fees were not authorized under the parties' agreements.

About a year after the lending relationships began, NH (and its managing

member, Zareh Najarian) executed a forbearance agreement (that extended maturity dates on loan advances made under the original loan documents) and a new set of loan documents to be used in connection new loans. 4-ER-583. The forbearance agreement contained a release. 4-ER-585–586. CAF did not sign the forbearance agreement. 4-ER-588. Despite this and other infirmities, the District Court ruled that the release effected a release of both Plaintiffs' claims, both past and future.

CoreVest, the Defendant-Appellee and successor in interest to CAF, filed a motion for summary judgment. 5-ER-828. Plaintiffs filed a motion for partial summary judgment with respect to liability but not damages. 5-ER-806. By order entered December 2, 2021, the District Court, Hon. Phyllis J Hamilton, granted CoreVest's motion for summary judgment and denied Plaintiffs' motion for partial summary judgment. 1-ER-5. Judgement was entered the same day. 1-ER-4. On January 28, 2022, the District Court granted CoreVest's motion for attorneys' fees. 1-ER-2–3. Plaintiffs-Appellants seek review of these two orders.

SUMMARY OF THE ARGUMENT

*Summary of Plaintiffs' Argument that the Late Fees Charged by CAF*
*Were Illegal Penalties Rather than Enforceable Liquidated Damages*

The parties' loan agreements purport to allow CAF to charge Plaintiffs ten percent (10%) on any interest or principal amount due but not timely paid. 5-ER-910. CAF actually charged 5% rather than 10%. However, pursuant to the terms

of the loan agreements, the late fees were levied when NC or NH failed timely to pay either a monthly interest charge or a final principal payment when the loan made to purchase or finance a parcel matured, generally 180 days after the loan was made. Charging late fees that are calculated as a percentage of the amount of the outstanding loan constitutes an illegal penalty rather than an enforceable liquidated damages provision under long-standing California law. California law also required CAF to make a "reasonable endeavor" to analyze the costs it could expect to incur as a consequence of late payments, and price the late fee charge based on that analysis. CAF failed at both tasks.

*Summary of Plaintiffs' Argument that the Release*
*Executed by NH and Zareh Najarian Did Not Effect*
*a Release of the Plaintiffs Claims in this Proceeding*

When NH signed a new set of loan documents with CAF in 2015, NH also signed a forbearance agreement that extended the maturity dates on the advances made by CAF under the original loan documents. 4-ER-583. The forbearance agreement (called here the "First Amendment") contains a release (called here the "Release") By its express terms, the Release is invalid because it is not signed by CAF. 4-ER-588. The lack of CAF's signature also renders the Release unenforceable under the integration clauses contained in the parties' prior agreements, which the Release purports to amend. 4-ER-726, 5-ER-782. Those integration clauses require CAF's signature on any amendment. The Release does

not even purport to release any claims that might accrue in the future (as distinct from claims that are discovered in the future), though the District Court erroneously deemed *all* future claims released by both Plaintiffs. Even if the Release were deemed enforceable in some measure against NH, it is unenforceable against NC because NC did not sign it and obtained no consideration for the purported release of its claims. Moreover, it is contrary to public policy to release claims, whether past or future, for illegal penalties.

> *Summary of Plaintiffs' Argument that Release Fees*
> <u>*Were Not Authorized by the Parties' Agreements*</u>

The Release Fees charged to the Plaintiffs were not authorized by the parties' agreements. The parties' agreements permit the lender to charge the borrower fees that are described in the agreements as well as other charges that the lender "incurs." But the agreements did not permit the lender or its servicing agent to charge borrowers arbitrarily-priced Release Fees as a condition to releasing the collateral that secured the loans.

<u>STANDARDS OF REVIEW</u>

A district court's decision on cross motions for summary judgment is reviewed *de novo*. See *Guatay Christian Fellowship v. County of San Diego*, 670 F.3d 957, 970 (9th Cir. 2011); *Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.*, 546 F.3d 1142, 1145 (9th Cir. 2008); *Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002). The appellate court's review is governed by the same standard

used by the trial court under Fed. R. Civ. P. 56(c). *See Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003). On review, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021). The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. *See Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999).

<u>ARGUMENT</u>

I  **<u>The Late Fees Charged by CAF Were Illegal Penalties.</u>**

Section 3275, Cal. Civ. Code, unchanged since its enactment in 1872, provides:

> Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty.

Subsection 1671(b), Cal. Civ. Code , added in 1977 to the longstanding statute respecting liquidated damages, provides, in relevant part,

> a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances

existing at the time the contract was made.

These two provisions have long been interpreted in tandem: "California law has . . . long recognized that a provision for liquidation of damages for contractual breach . . . can under some circumstances be designed as, and operate as, a contractual forfeiture.  To prevent such operation, our laws place limits on liquidated damages clauses."  *Ridgley v. Topa Thrift and Loan Ass'n*, 73 Cal.Rptr 2d 378, 17 Cal. 4th 970, 953 P.2d 484 (Cal. 1998).

In *Ridgley*, an investor borrowed money secured by real property that Mr. Ridgley intended to improve and then sell.  The lender included a provision in an amendment to the original loan documents imposing a penalty of six-months' interest if Ridgley were late with even one payment before he paid off the loan.  Ridgley made one payment a few days late before he paid off the loan, and the lender levied a fee calculated as a percentage of the entire principal amount of the loan, without regard to compensating the lender for either (a) the anticipated administrative costs of dealing with late payments, or (b) untimely paid interest.  *Ridgley* restates the blackletter law of liquidated damages clauses:

> A liquidated damages clause will generally be considered unreasonable, and hence unenforceable under section 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. The amount set as liquidated damages 'must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.'

*Ridgley*, 73 Ca.Rptr.2d at 382, 17 Cal.4[th] at 977, 953 P.2d at 488, quoting *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.*, 9 Cal.3d 731, 739, 108 Cal.Rptr. 845, 511 P.2d 1197 (1973).

A There Was No Endeavor—Reasonable or Otherwise—To Approximate Losses Caused by Late Payments.

*Ridgley* and *Garrett* establish a necessary process for the contracting parties to ensure that late charges are not illegal penalties. Before the contract is signed, the parties[1] must endeavor "to estimate a fair average compensation for any loss that may be sustained." *Id*. If no such effort is made, then the contractual provision purporting to predetermine damages "must be construed as a penalty.'" *Id*.

CoreVest's responses to requests for admission establish that CAF made no "endeavor . . . to estimate a fair average compensation for any loss that may be sustained." Each of the Plaintiffs posed this request to CoreVest:

REQUEST FOR ADMISSION NO. 1: Admit that CAF made no effort to estimate a fair average compensation for any loss that it might sustain as a consequence of Najarian Capital's [or Najarian Holdings'] failure to make loan payments timely. 4-ER-621

Here is CoreVest's response to the request, less the objections:

CoreVest admits that CAF Lending, LLC ("CAF") did not calculate a fair

---

[1] As noted below, the reasonable endeavor requirement does not require negotiations in a consumer agreement context.

average compensation for any losses that might result from the Plaintiffs' failure to make timely loan payments . . . . 4-ER-621–622, 4-ER-632–633.

Plaintiffs posed similar requests in several variations, based on variations of this test articulated in different California cases. The relevant requests for admission asked CoreVest to admit that it had

A. "made no effort prior to executing the Najarian Holdings Loan Documents to estimate Defendant's administrative expenses and the cost of money wrongfully withheld in connection with any loan payments that Najarian Holdings might fail to make timely." 4-ER-623, 4-ER-634.

B. "performed no analysis (prior to executing the Najarian Holdings Loan Documents) of Defendant's actual losses caused by borrowers situated similarly to Najarian Holdings who failed to make their loan payments timely." 4-ER-623–624, 4-ER 634–635.

C. "performed no analysis (prior to executing the Najarian Holdings Loan Documents) of Defendant's anticipated losses in the event that Najarian Holdings failed to make its loan payments timely." 4-ER-624–625, 4-ER-635–636. And

D. "prior to executing the Najarian Holdings Loan Documents, Defendant did not estimate a fair average compensation for any loss that may be sustained in the event that Najarian Holdings failed to make its loan payments timely." 4-ER-626–627, 4-ER-637–638.

CoreVest admitted that CAF had performed no analyses or estimates as described in these requests for admission. CoreVest's responses to Requests for Admission 1, 4, 5, 6 and 10 establish that CAF did not attempt to make the analyses or estimates required by California law that might have resulted in a determination of an appropriate (rather than illegal) charges for late payments.

Cal. Civ. Code §1671(b) places the burden of showing the unreasonableness of a liquidated damages provision on the litigant challenging the late fee or other alleged illegal penalty in a non-consumer context. However, that burden is met where a borrower adduces evidence that the lender failed to "endeavor . . . to estimate a fair average compensation for any loss that may be sustained." *Ridgley, 73 Cal.Rptr.* at 382, 17 Cal.4th at 977, 953 P.2d at 488, and at n. 4. In a review of a judgment following a bench trial, *Ridgley* held that the late fee was an illegal penalty, noting that the lender presented no argument that the fee at issue "represents 'the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained' for late payment of an interest installment." *Ridgley* at n. 4.

> 'If the sum extracted from the borrower is designed to exceed substantially the damages suffered by the lender, the provision for the additional sum, whatever its label, is an invalid attempt to impose a penalty inasmuch as its primary purpose is to compel payment through the threat of imposition of charges bearing little or no relationship to the amount of the actual loss incurred by the lender.' (*Garrett*, supra, 9 Cal.3d at p. 740.)

*Ridgley*, *73 Cal.Rptr.* at 384, 17 Cal.4th at 981, 953 P.2d at 490-491, quoting *Garrett*, 9 Cal.3d at 740, 108 Cal.Rptr. at 845, 511 P.2d at 1197.[2]

---

[2] *Ridgley* expressly rejects the suggestion that *Garrett* does not apply to disputes, like those at issue in *Ridgley* and the case at bar, that involve an arms-length commercial transaction rather than a consumer transaction. *Ridgley* at n. 5.

B  <u>CoreVest's Post-Hoc Rationalizations Must Be Rejected</u>.

The District Court credited the statements of CoreVest's president that CAF's administrative costs for the loans to the Plaintiffs and its costs of capital increased as a consequence of late payments of interest and principal.  7-ER-1174. Defendant's president also stated that the late fees and default interest[3] were intended to compensate for these additional costs and that the terms in the Loan Documents setting the amounts to be charged to the borrower for default interest and late fees were standard in the industry.[4]  7-ER-1173.  Defendant's president did *not* testify that late payments by the Plaintiffs imposed any costs that could not have been anticipated and subjected to an analysis that could quantify those costs. Nor did he make any statement distinguishing the increased costs that the late fees were designed to cover from the increased costs that the default interest charges were designed to cover.  Indeed, CoreVest utterly failed to offer *any* evidence of the acts that California law requires of every lender that seeks to impose liquidated damages for a late payment; that is, evidence (A) that the costs were quantified or

---

[3] Plaintiffs have never challenged the default interest charged to them on any of the loans at any time during the litigation.  However, the District Court ignored Plaintiffs' statements that they did not challenge CAF's default interest charges. The District Court's holdings concerning default interest (1-ER-17) may, therefore, be ignored as the default interest charges are not relevant to Plaintiffs' claims.
[4] CoreVest's president's testimony that the default interest and late charges are standard in the industry was presumably proffered in support of CoreVest's argument that everyone does it, so it must be fine.

estimated as part of an effort to determine damages that would reasonably compensate for those costs; and (B) that this effort was undertaken *before* the parties agreed to the fee or formula for calculating liquidated damages. Plaintiffs, by contrast, offered indisputable evidence, in the form of multiple responses by CoreVest to Plaintiffs' requests for admission, that no such effort was undertaken by CAF, either prior to or contemporaneously with the negotiations that yielded the Loan Documents.

*Ridgley* and other cases interpreting Cal.Civ.code 1671 are abundantly clear that not only must a liquidated damages provision be the result of the "reasonable endeavor," that endeavor must take place *prior to* the formation of the contract. Analyses created after the contract is signed are simply not relevant.

> [A] bank is required to show that it actually engaged in some form of analysis to determine what losses it would sustain from breach, and that it made a genuine and non-pretextual effort to estimate a fair average compensation for the losses to be sustained. . . . [And] such an estimate cannot occur without some sort of analysis of the loss that is to be compensated. . . . *For the amounts of the challenged fees to have been such a result, the required reasonable endeavor logically must have preceded the setting of those amounts. Analysis of costs [years later] is not pertinent to [the lender's] motivation and purpose when it decided on the amounts of the late and overlimit fees in 1982.* (Emphasis added.)

*Hitz v. First Interstate Bank*, 44 CalRptr.2d 890, 901, 38 Cal.App.4th 274, 291 (Cal.App.1995). *Accord, Irwin v. Mascott*, 96 F.Supp.2d 968 (N.D. Cal. 1999) ("The parties' reasonable endeavor to estimate the loss must precede the setting of

fees. . . . Cost analyses or studies made subsequent to the agreements are not relevant to the validity of the fees." (*citing Hitz*).

Because CoreVest has judicially admitted that CAF made no reasonable endeavor to estimate its loss from late payments by the Plaintiffs, and performed no analysis prior to or contemporaneously with the execution of the loan agreements at issue that might have informed such an endeavor; and because the late fees were calculated simply as a percentage of the outstanding amounts of the loans; the late fees charged by CAF are, as a matter of law, illegal penalties.

C   Plaintiffs Were Not Obliged to Proffer Evidence
    in Response to CoreVest's Post-Hoc Rationalizations.

The District Court held:

Plaintiffs "fail to proffer any evidence that the late fees imposed were unreasonable. Plaintiffs fail to overcome defendant's rationale for the late fees and fail to establish that there were unenforceable penalties." 1-ER-17.

The District Court erred both in crediting CoreVest's post-hoc rationalizations and in criticizing Plaintiffs for failing to offer evidence that would directly challenge those rationalizations. The District Court effectively held that any *post-hoc* rationalizations by the lender (in this case, that the lender incurred certain categories of unquantified costs because a borrower failed to make timely payments) render legal *any* late fee and, consequently, completely immunize a lender's practices from a Section 1671 analysis. That reasoning turns on its head all of the jurisprudence on the subject.

*Util. Consumers' Action Network, Inc. v. AT & T Broadband of S. Cal., Inc.*, 135 Cal. App. 4th 1023 1035, 37 Cal.Rptr.3d 827 (2006) ("*UCAN*") was cited by the District Court for the proposition that negotiations by the parties are not necessary in order to satisfy the reasonable endeavor test. Although negotiations are not required in the consumer contract context, *UCAN* does *not* stand for the proposition endorsed by the District Court: that no reasonable endeavor whatsoever is necessary prior to entering into the agreement that provides for liquidated damages. Indeed, *UCAN* repeatedly acknowledges and endorses the caselaw requiring that a reasonable endeavor must be made to determine and price those costs.[5] [6] Unlike the defendant in *UCAN*, which had performed an analysis prior to setting a late fee of $4.75, CAF performed no such analysis, a fact it has judicially admitted. See pages 15-16 above. The District Court determined not only that no negotiation was necessary, but also that no reasonable endeavor need be performed prior to litigation. There simply is no support whatsoever for the District Court's rejection of the law stated by *UCAN*, *Hitz*, *Irwin*—and every other

_____

[5] *UCAN* notes that the defendant had performed an analysis of the costs that it would incur as a consequence of late payments, and then set a late fee charge of $4.75, which was less than the anticipated cost that would be incurred as a consequence of a late payment by a consumer. The *UCAN* plaintiffs acknowledged that the defendant had conducted its analysis before the late charge was imposed, and the plaintiffs did not contest the reasonableness of the analysis. *UCAN* at fn. 9.

[6] In the course of its extensive analysis of the history of the "reasonable endeavor" requirement, *UCAN* uses the phrase "reasonable endeavor" fifty-one times.

court that has addressed the issue—that the litigant defending the liquidated damages provision must show

- that it actually engaged in some form of analysis to determine what losses it would likely sustain from breach;

- that it made a genuine and non-pretextual effort to estimate a fair average compensation for the losses to be sustained; and

- that the analysis was conducted before the fees were set, not years later.

*Accord, In re Cellphone Termination Fee*, 193 Cal.App.4th 298, 326, 122 Cal.Rptr.3d 726, 750 (Cal. App. 2011) ("[The] evidence fails to establish any endeavor, reasonable or otherwise, to even approximate Sprint's actual damages flowing from breach of the term contracts by consumers, and instead reflects a marketing decision made with an entirely deterrent purpose and focus. We believe that Plaintiffs are correct that the reasonable endeavor test, to have any meaning, must necessarily focus on those circumstances actually considered in evaluating a liquidated damage provision, not post hoc rationalization.")

In short, The District Court's embrace of CoreVest's *post-hoc* rationalizations must be rejected and reversed.

D   The Late Fees at Issue Fail the "Reasonable Relationship" Test as a Matter of Law.

*Ridgley* holds: "A liquidated damages clause will generally be considered unreasonable, and hence unenforceable, under section 1671(b), if it bears no

reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach." *Ridgley*, 73 Cal.Rptr.2d at 382, 17 Cal.4th at 977, 953 P.2d at 488. If there is no such "reasonable relationship," then the clause "'must be construed as a penalty.'" *Id.*, quoting *Garrett*, 9 Cal.3d at 739, 108 Cal.Rptr. 845, 511 P.2d 1197. "The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract [Citations.]' (Ibid.)"

The *Ridgley* court reviewed the loan payment late fees at issue in *Garrett*, and noted that those late fees, like the late fees charged to Mr. Ridgley by his lender (and the late fees charged to Plaintiffs by CAF) were calculated *as a percentage of the entire loan balance*, regardless of the anticipated costs to the lender of a late payment. The *Ridgley* court quoted the Court's prior holding in *Garrett*:

> 'We are compelled to conclude that a charge for the late payment of a loan installment which is measured against the unpaid balance of the loan must be deemed to be punitive in character. It is an attempt to coerce timely payment by a forfeiture which is not reasonably calculated to merely compensate the injured lender.'

*Id.*

The *per se* prohibition against liquidated damages for late payment calculated as a percentage of the late-paid obligation is settled law. *Greentree Financial Group, Inc. v. Execute Sports, Inc*., 163 Cal.App.4th 495, 78 Cal.Rptr.3d

24 (Cal. App. 2008)(relying upon *Garret* and summarizing its holding as: a "late payment fee which was calculated as percentage of unpaid principal balance had little or no relationship to lender's actual loss, and therefore was an illegal penalty.").

The Note (5-ER-910) provides for late fees set as a percentage of the outstanding debt due, whether a monthly interest payment or the full outstanding debt due at the maturity of the term of the loan for each parcel. Ms. Stephanie Casper emphasized this fact with her email to the Plaintiffs on February 9, 2017, in which she stated "that there would be a 5% late fee *calculated on the principal balance of the matured assets* to the tune of $56,000 or so, over and above the late fees charged on interest late pays . . . ." 5-ER-804.

By their express terms, the Notes signed by the Plaintiffs provide for exactly the same method of calculation that the *Ridgley* court deemed illegal: the charge of a late fee for a missed interest payment that was calculated in exactly the same manner for a missed principal payment: that is, as a percentage of the outstanding balance of the principal.

E   Monetary Relief Is Available under Section 1671, Cal. Civ.
    Code, to Compensate Plaintiffs for the Illegal Penalties They Paid.

In *Beasley v. Wells Fargo Bank*, 1 Cal.Rptr.2d 446, 235 Cal.App.3d 1383 (Cal. App. 1991), the court addressed whether the plaintiffs, who had paid late fees that were deemed penalties pursuant to Section 1671, may recover those penalties as damages from the lender.  After a thorough review of the statutory and common law history of Section 1671, the *Beasley* court concluded that Section 1671 provides an independent claim for monetary relief.[7]

Like the plaintiffs in Beasley, Plaintiffs are entitled to recover their damages, in amounts to be proven at trial, for the illegal penalties charged by and paid to CAF.

F   Plaintiffs Are Entitled to Partial Summary Judgment
    on their Claims that the Late Fees Were Illegal Penalties.

The terms of the Loan Agreements and the admissions made by CoreVest foreclose any possibility that the late fees charged by CAF are legal and enforceable.  As a matter of law, given the undisputed facts, Plaintiffs have

_____

[7] CoreVest has declined to seek actual damages from Plaintiffs in the event that Plaintiffs demonstrate their entitlement to recovery of their payments of the illegal penalties.  See Defendant's Answer (7-ER-1242).  Therefore, there was no need for expert testimony concerning the actual damages to which CoreVest might otherwise be entitled, "fairly measured by the period of time the money was wrongfully withheld plus the administrative costs reasonably related to collecting and accounting for a late payment."  [Citation omitted.]  *Garrett*, 108 Cal.Rptr. at 851-852, 9 Cal.3d at 741, 511 P.2d at 1203-1204.

demonstrated CoreVest's liability for damages to be proven at trial in the amount of such unlawful penalties charged as late fees.

## II  The Release Does Not Affect Any of the Plaintiffs' Claims.

In or about October, 2015, NH as borrower and Mr. Najarian as guarantor signed a "First Amendment" to NH's 2014 Loan Documents that purported to modify the loans then outstanding to NH.[8]  4-ER-583.  The First Amendment is a forbearance agreement pursuant to which NH and Mr. Najarian agreed to release their claims against CAF (none of which were specifically identified) and to pay some fees; and CAF agreed to extend maturity dates for 57 outstanding advances made to NH, each secured by a parcel of real property.  4-ER-590.  The provisions of the First Amendment that purport to release claims (found in Section 8) are referred to as the "Release."  NH and Mr. Najarian also signed contemporaneously with the First Amendment a new set of loan documents that covered loans to be made in the future to NH by CAF.  CAF did not sign the First Amendment (4-ER-588), and NC signed neither the First Amendment nor a new set of loan documents for loans to be made in the future.  The District Court concluded, erroneously, that the Release disposed of all of the Plaintiffs' claims.

CoreVest argues that the First Amendment effects a release of all claims

---

[8] The complete title of the document, hereafter referred to as the "First Amendment," is: "First Amendment to Revolving Loan Agreement, Promissory Note and Other Loan Documents and Guarantor Consent and Reaffirmation."

brought in this proceeding because the Release applies to

      a) both NH's and NC's claims,

      b) for both illegal penalties and Release Fees,

      c) both retrospectively and prospectively.

CoreVest is mistaken.

A  The Release Is Not Enforceable
Because It Was Not Signed by CAF.

*1.  The First Amendment Is, by Its Terms,
Ineffective Because CAF Failed to Sign It.*

The First Amendment includes this language at Section 2:

"Conditions to Effectiveness: The effectiveness of this Amendment is expressly conditioned upon the satisfaction of each of the following conditions, as determined by Lender in its sole and absolute discretion: a. This Amendment shall have been duly executed and delivered **by each of the parties herein**." 4-ER-584.

The First Amendment is not signed by CAF, though CAF is named as a party and the First Amendment contains a blank signature line for CAF. Because it is not signed, it is not enforceable, under its express terms that control the conditions for effectiveness.[9]

---

[9] Section 7 of the First Amendment provides as follows: "7. Governing Law. This Amendment shall be governed by and construed in accordance with the provisions of Section 10.21 of the Loan Agreement." 4-ER-585. The Loan Agreement (defined in Recital A of the First Amendment as the Revolving Loan Agreement between the parties dated as of October 3, 2014) provides at Section 10.21 that it shall be governed by and construed in accordance with the laws of the State of California. 5-ER-897.

### 2. The First Amendment Is Not Valid Pursuant to *the Integration Clause of the Loan Agreements.*

Not only does Section 2 of the First Amendment render the First Amendment unenforceable because it is not signed by CAF, so too does the Loan Agreement (for each of the Plaintiffs), which provides at Section 10.5 (entitled "No Waiver; Amendments"): "[N]o waiver, amendment or other variation of the terms, conditions or provisions of the Loan Documents whatsoever **shall be valid unless in writing signed by Lender**, and then only to the extent such writing specifically sets forth." 5-ER-894. Loan Agreement, section 10.5 (page 30). Therefore, under both the First Amendment and the principal document it was intended to amend, the First Amendment is simply not valid.

### 3. The First Amendment Is Unenforceable *Pursuant to the Parol Evidence Rule.*

The First Amendment is, by its terms, a modification of the NH Loan Documents. Section 6, First Amendment (4-ER-585). "Loan Documents" is a term used throughout the First Amendment, but it is defined in the Loan Agreement. ("All initially capitalized terms not specifically defined herein [that is, in the First Amendment] shall have the meanings ascribed to them in the [NH 2014] Loan Agreement unless otherwise expressly defined herein." Recital A, First Amendment) (4-ER-583). The 2014 NH Loan Agreement, in turn, defines

Loan Documents as follows:

> "Loan Documents" means the documents described in Section 4.6 and any
> other guaranties, agreements, documents or instruments now or hereafter
> evidencing, guarantying, **securing** or otherwise executed in connection with
> the Obligations or any and all Advances made hereunder, as such
> agreements, documents, and instruments may be amended, modified,
> extended, renewed or supplemented from time to time.

2014 NH Loan Agreement at page 5, Section 1.1 "Definitions." (Emphasis

supplied) (5-ER-869).

The First Amendment purports to modify many documents, including all

instruments that secure advances—that is, the deeds of trust—executed in

connection with each parcel financed by NH pursuant to the terms of the 2014 NH

Loan Documents. Under California law, deeds of trust are subject to the statute of

frauds, and documents that modify deeds of trust are also subject to the statute of

frauds. Therefore, the First Amendment is subject to the statute of frauds.

Consequently, to be enforceable, it must be signed. In *Secrest v. Security National

Mortgage Loan Trust 2002-2*, 167 Cal.App.4th 544, 547-548, 84 Cal. Rptr. 3d 275

(Cal. App. 2008) a forbearance agreement sent to the borrower by the lender,

signed by the borrowers, and promptly returned to the lender was nevertheless

deemed unenforceable because it was not signed by the lender. Since the

forbearance agreement constituted a modification of the note and deed of trust, and

the note and deed of trust were instruments that were governed by the statute of

frauds, the forbearance agreement also came within the statute of frauds, pursuant to Civil Code section 1698.  Although the borrowers argued that they had made payments pursuant to the terms of the forbearance agreement that had been accepted by the lender, the court held that "under well-established principles of California law, payment of money alone is not enough as a matter of law to take an agreement out of the statute of frauds, and the Secrests have legal means to recover the down payment if they are entitled to its return." *Id*., 167 Cal.App.4th at 548.

CAF drafted the First Amendment as an amendment to documents that are governed by the statute of frauds, and expressly made the First Amendment unenforceable unless signed by all parties.  And then CAF failed to sign it. CoreVest cannot prevail on its claim that Plaintiffs have forfeited rights pursuant to an unenforceable document.

B  <u>Neither NH nor NC Released Claims for Future Breaches of Contract.</u>

CoreVest argued in the District Court that the Release applies to all future claims that either NH or NC might bring, regardless of whether such claims are premised upon events or transactions that had occurred at the time that NH signed the First Amendment, or later.  The District Court agreed, concluding that "Plaintiffs released all of their claims under the 2014 Loan Documents . . . ."  1-ER-13.  That conclusion is unsupportable.

Even assuming that the Release is enforceable in any respect, by its terms it

encompasses only those claims and liabilities "whether heretofore or now existing" (subsection 8.a) (4-ER-585–586), regardless of whether the facts underlying such claims were known or unknown (subsection 8.c).  The Release contains no language that would support a conclusion that the releasing parties intended to release claims that *accrued* in the future—such as breach of contract claims.  The First Amendment modifies and extends the deadlines applicable to advances for loans advanced under the terms of the NH 2014 Loan Agreement.  It does not abrogate either of the Plaintiffs' 2014 Loan Agreements.  By the express terms of the First Amendment, the NH 2014 Loan Documents continued to govern the loans secured by the 57 properties listed on Exhibit A to the First Amendment.[10] Because the summary judgment evidence demonstrates that the 2014 Loan Agreements continued to be the operative agreements with respect to the 57 loan advances outstanding to NH (and to an undetermined number of loans outstanding to NC) even after the First Amendment was signed by NH and Mr. Najarian, there is no basis for the District Court's conclusion that each of Plaintiffs waived all of their claims under the 2014 Loan Agreements.  At least 57 loans to NH remained outstanding, as well as some as number of loans (not shown in the record) to NC.  CAF charged Release Fees when all of those loans closed and late fees in

_____

[10] The last page of the First Amendment is a list of the 57 properties that are the subject of the extensions of expiration dates for the associated advances.  4-ER-590.  All of the expiration dates were extended several months to dates in 2016.

connection with many (and perhaps all) of those advances *after* the effective date of the First Amendment. Accordingly, many of the breaches of contract alleged in this proceeding did not occur with respect to those transactions until after the effective date of the First Amendment, when the Release Fees and late fees were charged.

The language of the Release demonstrates that the Release does not apply to claims of any person or entity that *accrue* after the effective date. However, even if the language of the Release were deemed to permit claims that accrue in the future (in addition to claims existing at the time of execution that are discovered in the future), only those claims that rely upon the *identical factual predicate* as the released claims would be barred by the release.

In *Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010) the court noted that a settlement agreement that bars future claims may preclude a party from bringing a claim in the future, "but only where the released claim is 'based on the identical factual predicate as that underlying the claims,'" quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir.2008). Although *Hesse* and *Williams* involved releases approved by courts in connection with the resolution of class actions, the logic is equally applicable in other contexts. If the releasee were privileged to commit breaches of the parties' continuing contractual relationship, the contracts themselves would be vitiated as illusory because they would be unenforceable.

C   NC Did Not Release Any of Its Claims.

For the reasons noted above, the First Amendment is not enforceable against even the signatories.  For those same reasons, it is not enforceable against NC.  However, even if the First Amendment were deemed enforceable against NH, the Release is nevertheless *not* enforceable against NC.

1   *The Release, by its terms, Excludes Claims that Were Owned by NC.*

The Release provides at Section 8.f. that "The Loan Parties [defined in the first sentence of Section 8 as Borrower (NH) and Guarantor (Mr. Najarian)] represent and warrant that they are the sole and lawful owners of all right, title and interest in and to **all of the Claims released hereby** . . . ."  (Emphasis added.)  4-ER-586.  CAF, NH and Mr. Najarian all knew that CAF had made loans to NC.  Yet, the Release makes clear that the "Claims" being released are solely those of NH and Mr. Najarian.  Hence, the release of all of those Claims owned by the Loan Parties, even though made by the Loan Parties for themselves and for their "affiliates," were nevertheless restricted to claims then-owned by the Loan Parties, NH and Mr. Najarian.

2   *NC Did Not Receive Any Consideration for the Purported Release.*

NC received no consideration for the purported release of all of its claims under the terms of the Release.  Indeed, even the First Amendment's recitation of the consideration that supports the First Amendment refers only to the benefits that

CAF is providing to the other signatories to the agreement, NH and Mr. Najarian. If the named parties to the transaction had actually intended to provide some benefit to NC in exchange for a release of Claims by NC, they certainly could have made such a statement. Without any consideration or legal benefit to NC, in combination with the definitions of Claims that excludes claims that are not owned by NH or Mr. Najarian, the First Amendment is not enforceable against NC.

The preconditions of a valid contract are (a) parties capable of contracting, (b) their consent, (c) a lawful object, and (d) sufficient cause or consideration. 1 Witkin, Summary of Cal. Law, Contracts, § 3, p. 61, citing Cal. Civ. Code, § 1550; *Weddington Productions v. Flick*, 60 Cal.App.4th 793, 811 (1998). NC did not sign the First Amendment. Hence, there is no evidence that it consented to the waiver or release of any of its claims. Moreover, there is no evidence proffered by CoreVest that NC was provided any consideration for the purported release of its claims. Therefore, CoreVest's argument that NC, a non-party to the First Amendment, waived its claims against CAF fails on two of the four preconditions necessary for the formation of a contract.

### 3    *NC Was Not an Affiliate of the "Loan Parties" within the Meaning of the First Amendment.*

The District Court determined that the claims of NC, a non-party to the First Amendment, were released because NC was an "affiliate" of the actual signatories to the First Amendment, Zareh Najarian and NH. However, since NC was itself a

contracting party with CAF (as evidenced by the 2014 Loan Agreement entered into by NC and CAF), and since the Release by its express terms affected only the claims *owned* by NH or Mr. Najarian, "affiliate" cannot, in this context, reasonably include the claims indisputably owned by NC and not owned by NH or Mr. Najarian.

D   The Release Was Ineffective to Release Past or
    Future Claims that the Late Fees Were Illegal Penalties.

CoreVest argued, and the District Court agreed, that all claims of both Plaintiffs, past and future, were released. But that argument is entirely unavailing where the claims purportedly released are for the recovery of illegal penalties charged in contravention of a public policy.

In *Graylee v. Castro*, 52 Cal.App.5th 1107, 265 Cal.Rptr.3d 885 (Cal. App. 2020), the court addressed whether a court may enter a judgment that included purported liquidated damages that were in fact illegal penalties contrary to the public policy against such penalties expressed in Sections 1670 and 1671, Cal. Civ. Code.

> [A] court cannot enter a judgment that contains an unenforceable liquidated damages clause. "[S]ection 664.6 [which permits a court to enforce parties' settlement agreements arising out of the case pending before the court] does not allow a court to endorse or enforce a provision in a settlement agreement or stipulation which is illegal, contrary to public policy, or unjust." *Timney v. Lin*, 106 Cal.App.4th 1121 1127, 131 Cal.Rptr.2d 387 (2003) ("[A] court cannot validly enter a judgment or order which is void even if the parties agree to it."); *Vitatech International, Inc. v. Sporn*, 16 Cal.App.5th at p. 807,

131 Cal.Rptr.2d 387 (2017). Unenforceable liquidated damages provisions are void as against public policy. *Id*. As such, "a stipulated judgment that includes an unlawful liquidated damages provision is void and may be vacated."

*Graylee*, 52 Cal.App.5th at 1113-1114. Hence, parties to a negotiated settlement of claims, in which the parties are represented by counsel and are aware of the claims being released, may not dispense with the public policy of California by ratifying the payment of illegal penalties. California jurisprudence forbids the use of contracts to circumvent the public policy against charging illegal penalties dressed up as liquidated damages or late fees. "The public policy expressed in Civil Code section 1670 and 1671 may not be circumvented by words used in a contract. *Purcell v. Schweitzer*, 224 Cal. App. 4th 969, 975 (2014).

In *Hardwick v. Wilcox*, 11 Cal.App.5th 975, 217 Cal.Rptr.3d 883 (Cal. App. 2017) a unilateral release contained in a loan forbearance agreement (similar to the unilateral release and forbearance agreement contained within the First Amendment) was ineffective to release usury claims because the release contravened public policy. The release was not even part of a settlement of claims that had been asserted, and, like the claims purportedly released in the First Amendment, the usury claims were not known to either party to the release.

The District Court enforced—by deeming the Release enforceable—an illegal forfeiture, despite an unbroken line of cases prohibiting entry of such a

judgment.

There can be no doubt that Plaintiffs' claims for damages for the illegal penalties they paid were not barred by a release that was (a) unilateral, (b) executed without benefit of counsel, (c) against the clear public policy of California, and (d) part of a loan forbearance rather than a settlement of known claims. For all of these reasons, CoreVest has failed to show that the Release must be enforced as a matter of law. Moreover, "[w]hether the releaser intended to discharge such claims [including unknown claims] or parties is ultimately a question of fact. *Leaf v. City of San Mateo*, 104 Cal.App.3d 398, 163 Cal.Rptr. 711 (Cal. App. 1980).

**III** **The Plaintiffs Are Entitled to Partial Summary Judgment on their Claims that the Release Fees Were <u>Not Authorized and Constitute Breaches of the Agreements.</u>**

The Loan Documents permit CAF to shift some cost, fees and expenses ("CF&E") to Plaintiffs. None of the applicable provisions entitled CAF (or its loan servicer) to charge Plaintiffs the Release Fees.[11]

A The Release Fees Were Not:
(i) Described in the "Loan Documents";
(ii)"Incurred by Lender"; or
(iii)<u>"Costs and Expenses of Lender."</u>

---

[11] Although the Note and Loan Agreement executed by each Plaintiff differ in minor respects from those agreements executed by the other Plaintiff, there are no such differences in the language of the provisions discussed herein concerning allowable CF&E. Accordingly, the references to sections of (and language in) the "Note" and the "Loan Agreement" refer to the Note and Loan Agreement signed by each Plaintiff.

Section 3.3 of the Note provides, in relevant part:

> Borrower shall pay to Lender all other[12] fees as and when required pursuant to the Loan Documents. In addition to any Cash Advance Fee, Borrower shall pay to Lender, on or prior to closing of the Loan, all closing costs and other fees and expenses incurred by Lender in connection with the Loan (including appraisal fees, title insurance premiums, escrow fees, recording fees, cost review and legal fees), as more particularly set forth in Section 10.8 of the Loan Agreement.  5-ER-953.

To understand the scope and meaning of Section 3.3 in the context of whether the Release Fees were authorized, some definitions must be reviewed.  "Loan Documents" is defined in Section 1 of the Note as follows:

> the Note, the Loan Agreement, the Deed of Trust and other instruments and agreements executed by Borrower in favor of Lender or between Borrower and Lender, along with all other documents defined as "Loan Documents" under the Loan Agreement, are collectively referred to as the "Loan Documents."  5-ER-952.

"Loan Agreement," is, in turn, defined (in the same Section 1 of the Note) as "that certain Revolving Loan Agreement of even date herewith between Borrower and Lender."  To understand the scope of "all other documents defined as 'Loan Documents' under the Loan Agreement," one must look to the definition of "Loan Documents" in the Loan Agreement.  In the Definitions section of the Loan Agreement, "Loan Documents" is defined as

---

[12] The "other" fee that is apparently referenced here is the "Cash Advance Fee" discussed in the immediately preceding section, Section 3.2., as well as in the second sentence of Section 3.3.

the documents described in Section 4.6[13] and any other guaranties, agreements, documents or instruments now or hereafter evidencing, guarantying, securing or otherwise executed in connection with the Obligations or any and all Advances made hereunder, as such agreements, documents, and instruments may be amended, modified, extended, renewed or supplemented from time to time.  5-ER-951.

Section 3.3 of the Note also incorporates by reference Section 10.8 of the

Loan Agreement.  That Section provides:

10.8 Payment of Expenses. Borrower shall pay on demand all costs and expenses of Lender in connection with the negotiation, preparation, execution, delivery, administration, amendment, waiver and enforcement of the Loan Documents and any workouts or other matter related thereto and any litigation or dispute with respect thereto (including, without limitation, any bankruptcy or similar proceeding), including, without limitation, attorneys' fees and disbursements and fees and costs of any consultants to Lender. This Section 10.8 shall survive closing of the Loan and repayment thereof.  5 ER 944.

---

[13] Section 4.6 of the Loan Agreement provides:
 4.6 Delivery of Loan Documents. Borrower shall deliver to Lender the following documents, in form and content satisfactory to Lender, duly executed (and acknowledged where necessary) by the appropriate parties thereto:
 4.6.1 this Agreement;
 4.6.2 the Note;
 4.6.3 the Deed of Trust;
 4.6.4 the Financing Statements;
 4.6.5 the Limited Guaranty;
 4.6.6 the Environmental Indemnity;
 4.6.7 the Pledge Agreement;
 4.6.8 the Completion Guaranty; and
 4.6.9 such other documents that Lender may require.
 5-ER-927.

Taken together, these provisions obligate the Borrower to pay CF&E described in three overlapping categories: (a) CF&E described with particularity in the "Loan Documents," such as "appraisal fees, title insurance premiums, escrow fees, recording fees, costs review and legal fees" (see Section 3.3 of the Note and the definitions of "Loan Agreement" and "Loan Documents" in Section 1 of the Loan Agreement); (b) "closing costs and other fees and expenses incurred by Lender in connection with the Loan" (see Section 3.3 of the Note); and (c) "all costs and expenses of Lender in connection with the negotiation, preparation, execution, delivery, administration, amendment, waiver and enforcement of the Loan Documents" (see Section 10.8 of the Loan Agreement).

In sum, the CF&E that the Borrower agreed to pay were (a) the CF&E specifically described in the Note and the Loan Documents,[14] (b) the CF&E that the lender "incurred," and (c) the CF&E "of Lender."

CAF did not "incur" the Release Fees, nor were the Release Fees CF&E "of Lender." Indeed, the Release Fees were charged to each of CAF's borrowers, including Plaintiffs, by Cohen, the loan servicer, and Cohen kept all such fees as part of its loan servicing agreement with CAF. (Deposition of Samuel Harrity, 4-

---

[14] As noted below at pages 42-43, the Release Fees differ in kind from the specifically-described CF&E that are "appraisal fees, title insurance premiums, escrow fees, recording fees, cost review and legal fees . . . " This list of CF&E reimbursable to the lender supports Plaintiffs' argument that the parties did not obligate the Plaintiffs to pay the Release Fees.

ER-657)  CoreVest's Senior Vice President, Samuel Harrity testified that CAF **did not** incur the Release Fees as costs or keep the revenue represented by the collection of the Release Fees:

> Q: Now, did CAF and then CoreVest actually charge this release fee to the Najarian companies?
>
> A: A release fee was charged as part of the payoffs.
>
> Q: Okay. And so that was money that your company, whether it was CoreVest or CAF, received at the end of the loan.
>
> . . .
> A: It did not. The release of mortgage was done by Cohen Financial and that money was kept by Cohen Financial to cover their costs and -- and to pay the release, the recording fees.

4-ER-657.

CAF's witness is clear that the Release Fees did not represent either a charge made to CAF or even identifiable, discrete out-of-pocket costs to Cohen (other than the relatively inexpensive recording fees).  The $250 charge labelled "Release Fees" on payoff statements created by Cohen was a charge to the borrower whose amount was negotiated between CAF and Cohen.  Harrity testified:

> Q: Did CAF decide what the amount of the release fee would be?
>
> A: We negotiated the release fee with Cohen as part of their Servicing Agreement to get it to be as --as low as we could get from them, but Cohen provided us with the cost or the rate.
>
> Q: The fee.

A: Yes.

Q: Do we recall, as we sit here today, what that release fee was?

A: It was $250 per asset.

Q: Were some borrowers charged an amount other than $250 per property released during the time period 2014 through 2017?

A: Not to my knowledge. We negotiated this fixed rate from Cohen for all assets.

4-ER-667.

When the original loans to the Plaintiffs were negotiated in 2014, the loan servicing agreement between CAF and Cohen was in place. CAF therefore knew from the inception of the Plaintiffs' loans that CAF would *not* be incurring any of the costs represented by the Release Fees, which would in all cases be incurred by Cohen.

B   The Release Fees Are Not *Eiusdem Generis* with the
    Closing Costs Described in Section 3.3 of the Note.

Section 3.3 of the Note obligates the Borrower to pay "all closing costs and other fees and expenses incurred by Lender in connection with the Loan" and provides six specific examples of such CF&E:

- appraisal fees,

- title insurance premiums,

- escrow fees,

- recording fees,

- cost review, and

- legal fees.

These six kinds of CF&E share important characteristics. All six (with the possible exception of "cost review") are CF&E for which the prices are set by independent third parties acting in relatively well-developed marketplaces for their services.[15] The parties' logic for structuring the fee-shifting regime based on prices over which the lender has little or no control is sound. If a third party that renders charges that will be shifted to the borrower is not beholden to the lender, there is less opportunity for the lender to take unfair advantage of the borrower by setting an arbitrary charge in collusion with that third party. At least five of the six—and probably all six—kinds of costs specifically described in Section 3.3 of the Note are CF&E set by government fiat or a relatively efficient marketplace over which the lender would presumably have little or no influence.

In addition to the six particular kinds of charges described, the borrower is also liable for CF&E "incurred by Lender" or "of Lender." While is it possible that a Lender might agree to incur or pay CF&E that is overpriced and then charge that CF&E to the borrower, that would seem to be a strange, self-defeating strategy

---

[15] Although recording fees are not set by a market, they are impervious to manipulation by a lender. And while title insurance premiums are entirely or mostly determined by regulators, the premiums are, like recording fees, impervious to any individual lender's influence.

for a lender subject to market forces (as, presumably, CAF was and CoreVest is). But, at any rate, the summary judgment evidence is clear (from Harrity's testimony at the very least) that the Release Fees were never "incurred by Lender" or "of Lender."

C   The Loan Documents Describe a Fair and
    <u>Sound Regime for Reimbursement of Costs</u>.

The logic—not to mention fairness—of this regime adopted by lender and borrower for reimbursement of CF&E is reinforced by the absence in the Loan Documents of a catchall provision that requires the borrower to pay whatever CF&E the lender determines, at its whim, must be paid by the borrower, regardless of whether the CF&E was incurred by the lender.

On the other hand, the Loan Documents do not disclose:

(a) that the loan will be serviced by a third party;

(b) that the third-party loan servicer will charge fees to the borrower that are not "incurred by Lender;"

(c) that the fees will not be determined in an efficient marketplace over which the lender has little or no control but, instead, by undisclosed negotiations directly between the loan servicer and the lender;

(d) that the undisclosed fees would cover overhead costs and profits of that loan servicer; and

(e) that the amount and nature of the fees to be charged to the borrower will

not be disclosed to the borrower until the first Advance under the loan is set to be paid, presumably months after the borrower and lender sign the Loan Documents.

Since the Loan Documents do not describe the Release Fees or even the profits, tasks or costs (except the recording fees) that are evidently paid for with the Release Fees, the Loan Documents are consistent with the underlying drafting principle that *only* CF&E clearly described and rendered by third parties not controlled by the Lender, or incurred by the Lender and directly associated with a loan to a particular borrower, are chargeable to a borrower. The limits upon CF&E that may be charged to the borrower are consistent with the parties' evident intention that the lenders' overhead CF&E (including, for example, the costs of employing staff, buying or renting lender's equipment and office space, utilities, and other elements of overhead) will be covered with the initial loan fees, the Cash Advance Fees and the interest charges—and not CF&E charged to the Borrower. After all, the lender can easily estimate and budget its overhead costs and set its fees and rates accordingly to cover those costs, together with profit, with the Advance fees and interest charges. This arrangement relieves the lender of any obligation to disclose its overhead costs to the borrower. Moreover, such a transparent approach to CF&E associated with the loan reduces the borrower's risk that after it commits itself to repay thousands or millions of dollars, the borrower

will then be squeezed by the lender with

(a) fees that are not disclosed or explained before the borrower executes the loan documents;

(b) fees that become apparent only when the loans are being repaid several months after the advances were made and the borrower has accepted several million dollars' worth of loans; or

(c) fees that the lender may set or escalate without the consent of the borrower.

CoreVest's summary judgment papers imply that CAF's failure to describe in the Loan Documents the Release Fees or the constituent costs covered by the Release Fees (that is, the overhead expenses of a third-party loan servicer) was, essentially, an oversight that should be remedied by shoehorning the Release Fees into some unidentified language in the Loan Documents. Cite. But perhaps the failure was not an oversight and was, instead, intentional. Perhaps CAF knew that it would entice fewer customers if it disclosed in its loan agreements that it would be setting certain closing fees for each transaction with a servicing agent; that it would negotiate those fees without any restrictions imposed by the agreements with the borrower; and that such a scheme would allow CAF to initiate (and profit from) lending relationships that would not otherwise start if the loan documents were transparent about those fees. What if CAF had stated clearly in the Loan

Documents (instead of admitting grudgingly after being sued): "Our loan servicer will charge you fees that we will negotiate to maximize our profits and the loan servicer will negotiate to maximize its profits; you will have no control over the amount of those fees; we will not tell you the amount of those fees until the loan becomes due; and you must pay those fees at the rate set by us, the lender, and the loan servicer, as a prerequisite for the release of your collateral"?

D   The High Cost of the Release Fees Is Not a Basis of the Plaintiffs' Claims, and Cannot Be a Basis for Affirming Judgment Against Plaintiffs.

The District Court determined that Plaintiffs were liable under the terms of the Loan Documents for the $250 Release Fees charged to the Plaintiffs by Cohen when each loan Advance was repaid.  In support of its conclusion, the District Court noted that Mr. Najarian testified that he was frustrated by the high cost of the Release Fees.  1-ER-14.  The District Court also noted that "Plaintiffs offer no authority to suggest that such frustration invalidates the fees charged."  *Id*.  Indeed, Plaintiffs offered no authority to support that proposition because the proposition is not—and never was—advocated by Plaintiffs.  While Mr. Najarian was personally frustrated by the exorbitantly high Release Fees, the $250 amount of the charge has never been the liability basis of Plaintiffs' claims.  The actual claim by Plaintiffs is, and has always been, that the Release Fees were unauthorized under the parties' agreements and, therefore, charging Release Fees constitutes repeated breaches of contract.

E   <u>The Release Fees Were Not "Pass-Through" Charges.</u>

The District Court determined that the Release Fees charged to the Plaintiffs were "pass-through" fees.  1-ER-13.  That characterization is misleading and unfounded, and certainly not demonstrated as a matter of law by the summary judgment evidence.

The District Court's determination that the Release Fees were "pass-through" charges is misleading because there were two categories of costs incorporated into the $250 Release Fees.  The Release Fees were paid by the Plaintiffs to Cohen only (and not to CAF), and effectively reimbursed Cohen for the cost of recording releases of the security deeds that were filed with Georgia Superior Court clerks when loan advances were repaid.  4-ER-667.  To this extent only, the Release Fees might be characterized as "pass-through" charges.  However, the Release Fees far exceeded the cost of those recording fees (4-ER-580), thereby effectively paying Cohen for its indeterminate, undefined overhead expenses and profits.

<u>CONCLUSION</u>

CAF was a rogue lender.  The late fees that CAF charged Plaintiffs were illegal based on each of two independent tests used by California courts.  The late fees were *per se* illegal because they were calculated as a percentage of the outstanding amount of the loans, a practice that has been clearly illegal since at

least 1998, the year of the *Ridgley* decision. Under the Loan Agreements at issue, if a borrower is one day late paying off a $100,000 loan, that creates a liability of $5,000—effectively an interest rate of 1820%, if only for a day. CAF also failed to analyze or estimate the administrative costs it would incur as a consequence of late payments, or to set a fee or formula that would approximate those costs. Instead, CAF simply picked a calculation designed to coerce borrowers into compliance. The District Court's conclusion that it should immunize patently illegal penalties and reward CoreVest's post-hoc rationalizations for those illegal penalties must be reversed as wholly unsupported by decades of settled law.

Although the late fees that CAF charged Plaintiffs were illegal, they were at least disclosed in the Loan Documents. The exorbitant Release Fees were not. Nor were the Release Fees even authorized by the parties' agreements, which allowed the CAF to collect only described costs and costs that the lender "incurred." The testimony of CoreVest's Senior VP was clear that the Release Fees were never incurred by CAF. Moreover, the Plaintiffs never agreed to pay arbitrary fees to cover the overhead and profit of an undisclosed third-party loan servicer. CAF knew that it borrowers would be charged an unauthorized $250 Release Fee every time they paid off a loan, but that fact was not disclosed anywhere in the agreements. The agreements actually do protect the borrower

against charges that are not incurred by the lender.  But CAF breached those agreements.

The District Court held that the Release executed by NH and Mr. Najarian released all claims, past and future, by both Plaintiffs, despite the fact that it is, by its terms, invalid because it was not signed by CAF.  And despite the fact that it does not even purport to release claims that might accrue in the future.  And despite the fact that it restricts the claims released to only those claims that were owned by NH and Mr. Najarian at the time the Release was signed by them.  And despite the fact that claims for illegal penalties cannot be released, especially where the claims are not even known to the releasing party.

The District Court erred in its analyses of the all three of the principal issues before the Court.  Plaintiffs seek the reversal of the District's Court's grant of summary judgment to Corevest and reversal of the denial of Plaintiffs' motion for partial summary judgment.  Plaintiffs request that if this Court reverses the District Court's grant of summary judgment to CoreVest, it also reverse the District Court's tax of costs against Defendant, tax Defendant with the costs of this appeal, and reverse the award of attorneys' fees to CoreVest.  *U.S. v. 4,432 Mastercases of Cigarettes*, 448 F.3d 1168 (9th Cir. 2006) (Fee award vacated where the district

court awarded attorneys' fees based on its grant of summary judgment, which the

was reversed.) *citing Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 617 (9th

Cir.2003) and *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 373-74 (9th

Cir.1996).

Dated:  May 12, 2022                        Respectfully submitted,

                                            THE REICH LAW FIRM


                                            By: __s/ Jeff_Reich_____
                                                Jeff Reich, Attorneys for the Plaintiffs,
                                                Najarian Holdings LLC and
                                                Najarian Capital LLC

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-15010

I am the attorney or self-represented party.

**This brief contains** | 10,746 | **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated |       | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Jeff Reich      **Date** | 5-12-2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**          *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 22-15010

The undersigned attorney or self-represented party states the following:

◉ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Jeff Reich    **Date** 5-12-2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                      *New 12/01/2018*

053