No. 22-15010

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

NAJARIAN HOLDINGS LLC AND
NAJARIAN CAPITAL LLC,

*Plaintiffs-Appellants*,

v.

COREVEST AMERICAN FINANCE LENDER LLC,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California, Oakland Division
No. 4:20-cv-00799-PJH
Hon. Phyllis J. Hamilton

---

## APPELLEE'S ANSWERING BRIEF

---

Emil Petrossian (CA SBN 264222)
Jason C. Linger (CA SBN 323031)
GLASER WEIL FINK HOWARD
  AVCHEN & SHAPIRO LLP
10250 Constellation Boulevard, Suite 1900
Los Angeles, California 90067
Tel.: (310) 553-3000  |  Fax: (310) 556-2920

*Attorneys for Defendant-Appellee*
COREVEST AMERICAN FINANCE
LENDER LLC

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1, counsel for defendant-appellee

CoreVest American Finance Lender LLC ("CoreVest") certifies that

CoreVest's parent company is Redwood Trust, Inc., and that no publicly

held corporation owns 10% or more of CoreVest's stock.


Dated:    August 26, 2022          Respectfully submitted,

                                   GLASER WEIL FINK HOWARD
                                    AVCHEN & SHAPIRO LLP
                                   Emil Petrossian
                                   Jason Linger


                                   By:_____*/s/ Emil Petrossian*_____
                                       Emil Petrossian
                                       *Attorneys for Defendant-Appellee*
                                       COREVEST AMERICAN
                                       FINANCE LENDER LLC

i

# TABLE OF CONTENTS

**Page**

I.    JURISDICTIONAL STATEMENT .................................................. 1

II.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..... 2

III.  STATEMENT OF THE CASE .......................................................... 4

      A.    Summary of Relevant Facts .................................................. 4

            1.    Appellants and CAF executed two virtually identical loan agreements in 2014, creating two $5 million credit facilities with terms of one year from which Appellants obtained short-term loans to finance investment-property purchases. ....................................................... 4

            2.    The 2014 Loan Documents authorized CAF to charge, and obligated Appellants to pay, late fees on missed monthly interest payments and on Advances that Appellants failed to timely repay. ................................. 7

            3.    The 2014 Loan Documents authorized CAF to charge, and obligated Appellants to pay, a $250 document processing and lien release fee on each Advance. ......... 9

            4.    In October 2015, Najarian Holdings entered into a new loan agreement with CAF and, as part of that transaction, released all of Appellants' then-existing claims against CAF and its successors. ....................... 10

            5.    Appellants received hundreds of Advances from CAF totaling tens-of-millions of dollars, but were chronically late in paying monthly interest payments and repaying matured Advances. ....................................................... 12

ii

B.    Summary of Relevant Procedural History ........................... 13

    1.    Pleadings Stage .................................................. 13

    2.    Summary Judgment Stage ........................................ 15

    3.    Motion for Attorneys' Fees ...................................... 20

C.    Rulings Presented for Review ................................... 20

IV.    SUMMARY OF ARGUMENT ....................................... 21

V.    ARGUMENT .................................................... 23

A.    Standard of Review ............................................. 23

B.    Appellants' claims are barred under the 2015 Release. ....... 24

    1.    The 2015 Release bars Najarian Holdings's claims as a matter of law. ................................................. 24

    2.    The 2015 Release also bars Najarian Capital's claims as a matter of law, because Najarian Holdings executed the release on behalf of itself and all of its affiliates. . 28

    3.    Appellants have not raised any valid arguments against the enforceability of the 2015 Release. ........... 34

        a.    The Release is enforceable even though it does not bear CAF's signature .................................... 34

        b.    Enforcement of the Release has nothing to do with "future claims." .......................................... 39

        c.    Appellants' "public policy" arguments have no merit and do not preclude enforcement of the Release. .............................................. 43

iii

C.      Appellants' late-fee claim fails as a matter of law because none of the challenged late fees arose under the 2014 Loan Documents, and Appellants failed to carry their statutory burden of rebutting the presumed reasonableness of those fees. ....................................................................................... 46

        1.      None of the Advances as to which Appellants allege they were charged unlawful late fees arose under the 2014 Loan Documents. ................................................. 46

        2.      Appellants failed to carry their burden of rebutting the presumed reasonableness of CAF's late fees. .............. 47

                a.      Appellants failed to show that there is no reasonable relationship between CAF's late fees and the range of actual damages the parties could have anticipated would flow from a breach. ....... 49

                b.      Appellants also failed to show that CAF's late fees were not the result of a reasonable endeavor by the parties to estimate a fair average compensation. ..................................................... 56

D.      Appellants were obligated to pay a $250 release fee each time they paid off an Advance they had received from CAF. ..................................................................................... 61

        1.      The 2014 Loan Documents expressly obligated Appellants to pay the release fee. ................................ 61

                a.      The first sentence of Section 3.3 of the 2014 Promissory Notes obligated Appellants to pay the release fee. .................................................... 62

                b.      The second sentence of Section 3.3 of the 2014 Promissory Notes, and Section 10.8 of the 2014 Loan Agreements, also obligated Appellants to pay the release fee. ............................................... 64

       c.    Appellants' purported textual arguments do not support a finding that the release fee was not authorized. ............................................................ 67

    2.    Appellants' regular payment of the release fee confirms that the fee was authorized. ......................................... 70

    3.    Appellants failed to proffer any admissible evidence sufficient to create a genuine issue of material fact as to CAF's authorization to charge the release fee. ....... 72

VI.    CONCLUSION ................................................................ 75

STATEMENT OF RELATED CASES .................................... 77

CERTIFICATE OF COMPLIANCE ....................................... 78

CERTIFICATE OF SERVICE................................................ 79

# TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Alexander v. FedEx Ground Package Sys., Inc.,*
    765 F.3d 981 (9th Cir. 2014) ..................................................24, 61

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................72

*Armstrong v. Brown,*
    768 F.3d 975 (9th Cir. 2014) ........................................34, 37, 39, 55

*Barnwell & Hays, Inc. v. Sloan,*
    564 F.2d 254 (8th Cir. 1977) ..........................................................37

*Bd. of Trustees v. Agilent Techs., Inc.,*
    No. 18-cv-01199-VC, 2019 WL 4729602
    (N.D. Cal. Aug. 13, 2019) ...............................................................33

*Brunozzi v. Cable Commc'ns, Inc.,*
    851 F.3d 990 (9th Cir. 2017) ..........................................................24

*Cal. Med. Ass'n v. Shalala,*
    207 F.3d 575 (9th Cir. 2000) ............................................................2

*Campidoglio LLC v. Wells Fargo & Co.,*
    870 F.3d 963 (9th Cir. 2017) ..........................................................24

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ..........................................................................3

*Cruz v. Nat'l Steel & Shipbuilding Co.,*
    910 F.3d 1263 (9th Cir. 2018) ...................................................73, 74

*Dollar Tree Stores Inc. v. Toyama Partners LLC,*
    875 F. Supp. 2d 1058 (N.D. Cal. 2012) ..........................................48

*East West Bank v. Altadena Lincoln Crossing, LLC,*
    598 B.R. 633 (C.D. Cal. 2019) ......................................19, 57, 58, 60

*F.B.T. Prods., LLC v. Aftermath Records,*
    621 F.3d 958 (9th Cir. 2010) ..........................................................61

*French v. Bank of New York Mellon,*
    729 F.3d 17 (1st Cir. 2013) ............................................................... 37

*In re 3MB, LLC,*
    609 B.R. 841 (2019) ................................................................. 57, 60

*Johnson v. Columbia Props. Anchorage, LP,*
    437 F.3d 894 (9th Cir. 2006) .............................................................. 1

*Jones v. Royal Admin. Servs., Inc.,*
    887 F.3d 443 (9th Cir. 2018) ........................................................... 23

*Komatsu, Ltd. v. States S.S. Co.,*
    674 F.2d 806 (9th Cir. 1982) ........................................................... 34

*Laserage Tech. Corp. v. Laserage Labs., Inc.,*
    972 F.2d 799 (7th Cir. 1992) ........................................................... 37

*Los Angeles Lakers, Inc. v. Fed. Ins. Co.,*
    869 F.3d 795 (9th Cir. 2017) ........................................................... 24

*Marder v. Lopez,*
    450 F.3d 445 (9th Cir. 2006) ........................................................... 24

*Padfield v. AIG Life Ins. Co.,*
    290 F.3d 1121 (9th Cir. 2002) ......................................................... 23

*S. Cal. Gas Co. v. City of Santa Ana,*
    336 F.3d 885 (9th Cir. 2003) ............................................................ 3

*Suzuki Motor Corp. v. Consumers Union, Inc.,*
    330 F.3d 1110 (9th Cir. 2003) ......................................................... 23

*Thomas v. Cricket Wireless, LLC,*
    506 F. Supp. 3d 891 (N.D. Cal. 2020) ............................................. 33

*TVT Records v. Island Def Jam Music Group,*
    412 F.3d 82 (2d Cir. 2005) ............................................................... 35

*United States v. Sardie,*
    191 F. Supp. 2d 1128 (C.D. Cal. 2000) ........................................... 45

*Valenzuela v. ADT Sec. Servs., Inc.,*
    475 F. App'x 115 (9th Cir. 2012) .................................................... 48

## STATE CASES

*Benedek v. PLC Santa Monica, LLC*,
   104 Cal. App. 4th 1351 (2002) ...................................................... 24

*Better Food Mkts. v. Am. Dist. Tel. Co.*,
   40 Cal. 2d 179 (1953)........................................................ 19, 57, 60

*Cavanaugh v. Casselman*,
   88 Cal. 543 (1891)..................................................................... 38

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   68 Cal. App. 4th 445 (1998) .................................................. 32, 67

*Cohen v. Five Brooks Stable*,
   159 Cal. App. 4th 1476 (2008) ................................................... 45

*Crow v. P.E.G. Constr. Co.*,
   156 Cal. App. 2d 271 (1957) ...................................................... 33

*Dubois v. Sparrow*,
   92 Cal. App. 3d 290 (1979) ........................................................ 25

*Dyer Bros. Golden W. Iron Works v. Cent. Iron Works*,
   182 Cal. 588 (1920)................................................................... 58

*Eith v. Ketelhut*,
   31 Cal. App. 5th 1 (2018) ........................................................... 69

*Far West Servs., Inc. v. Livingston*,
   156 Cal. App. 3d 931 (1984) ...................................................... 37

*Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*,
   9 Cal. 3d 731 (1973)........................................................ 51, 56, 60

*Graylee v. Castro*,
   52 Cal. App. 5th 1107 (2020) ..................................................... 44

*Greentree Fin. Group, Inc. v. Execute Sports, Inc.*,
   163 Cal. App. 4th 495 (2008) .............................................. 49, 50

*Harbor Island Holdings v. Kim*,
   107 Cal. App. 4th 790 (2003) ..................................................... 48

*Hardwick v. Wilcox*,
   11 Cal. App. 5th 975 (2017) ....................................................... 44

viii

*Hitz v. First Interstate Bank*,
   38 Cal. App. 4th 274 (1995) ..........................................................55

*N.Y. Life Ins. Co. v. Hollender*,
   38 Cal. 2d 73 (1951)......................................................................32

*Nau v. Vulcan Rail & Constr. Co.*,
   36 N.E.2d 106 (N.Y. 1941) ...........................................................35

*Oceanside 84, Ltd. v. Fidelity Fed. Bank*,
   56 Cal. App. 4th 1441 (1997) ...............................................71, 72

*Otay Land Co., LLC v. U.E. Ltd., L.P.*,
   15 Cal. App. 5th 806 (2017) .........................................................29

*Ridgley v. Topa Thrift & Loan Ass'n*,
   17 Cal. 4th 970 (1998) ...........................................47, 48, 51, 56, 59

*Secrest v. Sec. Nat'l Mortg. Loan Trust 2002-2*,
   167 Cal. App. 4th 544 (2008) .................................................38, 39

*Steel v. Duntley*,
   115 Cal. App. 451 (1931) ..............................................................37

*Util. Consumers' Action Network, Inc. v.
   AT&T Broadband of S. Cal., Inc.*,
   135 Cal. App. 4th 1023 (2006) ...............................................57, 58

*Weber, Lipshie & Co. v. Christian*,
   52 Cal. App. 4th 645 (1997) .............................................48, 51, 61

*Whorton v. Dillingham*,
   202 Cal. App. 3d 447 (1988) .........................................................40

*Winet v. Price*,
   4 Cal. App. 4th 1159 (1992) ..........................................................45

## FEDERAL STATUTES

28 U.S.C. § 1291...............................................................................2

28 U.S.C. § 1332...............................................................................1

## STATE STATUTES

Cal. Civ. Code § 1541 ................................................................................ 33

Cal. Civ. Code § 1624(a) ........................................................................... 38

Cal. Civ. Code § 1638 ........................................................................ 32, 61

Cal. Civ. Code § 1641 ........................................................................ 32, 67

Cal. Civ. Code § 1642 ............................................................................... 35

Cal. Civ. Code § 1644 ............................................................................... 33

Cal. Civ. Code § 1717 ............................................................................... 20

Cal. Corp. Code § 150 .............................................................................. 29

## FEDERAL RULES

Fed. R. App. P. 28(a)(4) ............................................................................. 1

Fed. R. App. P. 28(a)(8)(A) ................................................................. 41, 70

Fed. R. App. P. 28(b) ............................................................................. 1, 2

Fed. R. Civ. P 12(b)(6) ....................................................................... 13, 14

Fed. R. Civ. P 56(e) .................................................................................. 72

Fed. R. Civ. P. 30(b)(6) ...................................................................... 42, 52

Fed. R. Civ. P. 56(c) ......................................................................... 23, 72

Fed. R. Evid. 401 ...................................................................................... 73

Fed. R. Evid. 402 ...................................................................................... 73

Fed. R. Evid. 602 ...................................................................................... 73

## I.   **JURISDICTIONAL STATEMENT**

The parties agree that this Court has, and that the District Court had, subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  However, the jurisdictional statement of plaintiffs-appellants Najarian Holdings LLC ("Najarian Holdings") and Najarian Capital LLC ("Najarian Capital") (each an "Appellant" and collectively, "Appellants") does not apply the correct analysis for limited liability companies.  *See Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) ("[A]n LLC is a citizen of every state of which its owners/members are citizens.").  Moreover, Appellants' jurisdictional statement does not conform to FRAP 28(a)(4).  Thus, pursuant to FRAP 28(b), defendant-appellee CoreVest American Finance Lender LLC ("CoreVest") presents its own jurisdictional statement.

Each of the Appellants is a limited liability company.  Zareh Najarian was the sole member of each of the Appellants when they filed this action in the District Court on February 3, 2020.  *See Harris v. Bankers Life & Cas. Co.*, 425 F.3d 689, 695 (9th Cir. 2005) ("Diversity jurisdiction is based on the status of the parties at the outset of the case . . . .").  Mr. Najarian was a citizen of Georgia on February 3, 2020.

1

CoreVest is a limited liability company. On February 3, 2020, CoreVest's members were citizens of California, Connecticut, Maryland, and New York. Therefore, complete diversity existed between Appellants and CoreVest at the outset of the case.

The amount in controversy, exclusive of interest and costs, exceeds $75,000.

Appellants are appealing from (1) the District Court's December 1, 2021 entry of final judgment in favor of CoreVest, 1-ER-4; and (2) the District Court's January 28, 2022 order granting CoreVest's motion for attorneys' fees, 1-ER-2–3. *See* 7-ER-1314. Both the final judgment and the District Court's fee award are appealable. 28 U.S.C. § 1291; *Cal. Med. Ass'n v. Shalala*, 207 F.3d 575, 576 (9th Cir. 2000).

## II.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Pursuant to FRAP 28(b), CoreVest presents its own statement of the issues because Appellants' statement does not accurately frame the issues the Court is being asked to address, disregards the standard of review governing Appellants' appeal, and improperly attempts to shift various burdens to CoreVest. To withstand CoreVest's summary judgment motion, ***Appellants*** bear the burden of producing admissible

2

evidence sufficient to create a genuine issue of material fact on each element of their claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). And on their own motion for partial summary judgment, Appellants bear the burden of establishing beyond controversy every essential element of their claims. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

The issues before this Court are as follows:

1.     Did the District Court correctly conclude (a) that Section 8 of the October 1, 2015 First Amendment to Revolving Loan Agreement, Promissory Note and Other Loan Documents and Guarantor Consent and Reaffirmation (the "First Amendment") was a valid and enforceable release of all then-existing claims against CAF Lending, LLC ("CAF") and its successor, CoreVest; (b) that Najarian Holdings and Mr. Najarian entered into the release on behalf of themselves and Najarian Capital; and (c) that the release is a complete defense to Appellants' claims for breach of contract and breach of the implied covenant of good faith and fair dealing as a matter of law?

2.     Did the District Court correctly conclude that Appellants failed to meet their burden, under Cal. Civ. Code § 1671(b), of

establishing that (a) CAF's late fees did not bear a reasonable relationship to the range of actual damages the parties could have anticipated would flow from a breach; and (b) the amount of CAF's late fees did not represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained?

3.    Did the District Court correctly conclude that the relevant loan agreements authorized CAF to charge, and obligated Appellants to pay, a $250 document processing and lien release fee for every loan advance Appellants received under those agreements?

## III.  <u>STATEMENT OF THE CASE</u>

### A.  <u>Summary of Relevant Facts</u>

**1.    Appellants and CAF executed two virtually identical loan agreements in 2014, creating two $5 million credit facilities with terms of one year from which Appellants obtained short-term loans to finance investment-property purchases.**

Appellants are a fix-and-flip business based in Atlanta, Georgia. 5-ER-962, 990; 6-ER-1166, 1169. They purchase hundreds of residential properties every year, renovate them, and sell them to third-party homebuyers. 5-ER-962, 990; 6-ER-1082. To finance their

4

property purchases, Appellants obtain short-term bridge loans from lenders, which typically mature and must be paid off in less than a year.  5-ER-991–92; 6-ER-1073; *see, e.g.*, 5-ER-872-§2.2.

For nearly three years spanning 2014 to 2017, CoreVest's predecessor, CAF, advanced to Appellants hundreds of short-term loans totaling tens-of-millions of dollars to finance Appellants' purchases of residential investment properties.[1]  7-ER-1172-¶3; 5-ER-964–65, 991; 6-ER-1162.  The initial agreements pursuant to which CAF advanced these loans were executed in 2014.  Specifically, in August 2014, CAF entered into a Revolving Loan Agreement with Najarian Capital, and in October 2014, CAF entered into a nearly identical Revolving Loan Agreement with Najarian Holdings (each a "2014 Loan Agreement" and collectively, the "2014 Loan Agreements").  5-ER-863–905, 915–50.

Accompanying each 2014 Loan Agreement was a Revolving Promissory Note Secured by Deeds of Trust (each a "2014 Promissory Note" and collectively, the "2014 Promissory Notes").  5-ER-906–14,

---

[1] The parties stipulated in the District Court that CoreVest is CAF's successor.  *See* 7-ER-1254.  CoreVest was substituted in as the named defendant in the Third Amended Complaint.  *Compare* 7-ER-1272-¶1, *with* 7-ER-1304-¶1.

951–58.  Each corresponding set of 2014 Loan Agreements and 2014 Promissory Notes (collectively, the "2014 Loan Documents") was executed by the same parties at the same time, and concerned the same subject matter.  5-ER-969, 972.  Further, each 2014 Promissory Note incorporated each corresponding 2014 Loan Agreement's terms, covenants, conditions, and agreements.  5-ER-907-§1, 952-§1.

Zareh Najarian is Appellants' sole member and chief executive officer.  5-ER-961–62.  Mr. Najarian signed and executed the 2014 Loan Documents on Appellants' behalf.  5-ER-903, 914, 950, 958.  The 2014 Loan Documents contained California choice-of-law provisions.  5-ER-897-§10.21, 913-§10.11, 946-§10.21, 957-§10.11.

Each 2014 Loan Agreement created a separate $5 million revolving credit facility from which Najarian Holdings or Najarian Capital (depending on the agreement) could obtain short-term loans at specified amounts to finance their property purchases of residential properties.  5-ER-869, 872-§§2.1–2.2, 921, 924-§§2.1–2.2.  Each agreement defined the corresponding $5 million credit facility as a "Loan."  5-ER-869, 920.  The "Loan Amount" was $5 million.  5-ER-869, 921.  And each short-term disbursement of Loan proceeds was an

6

"Advance." 5-ER-866, 918. The maturity date of each Loan (i.e., of each $5 million credit facility) was one year after execution, 5-ER-869, 921, meaning that each 2014 Loan Agreement carried a one-year term.

> **2.      The 2014 Loan Documents authorized CAF to charge, and obligated Appellants to pay, late fees on missed monthly interest payments and on Advances that Appellants failed to timely repay.**

Each Advance issued under the 2014 Loan Documents had to be paid off within 180 days after funding. 5-ER-872-§2.2, 924-§2.2. The parties often referred to Advances that were due for repayment as "assets" that had "matured." *See, e.g.*, 6-ER-1084, 1086, 1088, 1090–91, 1153.

For each Advance that Appellants received under the 2014 Loan Documents, Appellants had to pay monthly interest payments at the agreed-upon rate of 8% per annum. 5-ER-907-§2, 952-§2. Because Appellants paid only interest during the life of each Advance, they had to pay off the entire principal balance when an Advance matured. 5-ER-993.

To monitor and administer the Advances it disbursed to Appellants, CAF assigned its loan-servicing function to a company

called Cohen Financial ("Cohen").[2]  5-ER-1042–43.  In that capacity, Cohen sent monthly billing statements to Appellants, identifying the interest payments Appellants had to pay and the maturing Advances that Appellants had to repay each month.  5-ER-1040, 1054–55.

Appellants' failure to make timely interest payments or to timely pay off matured Advances constituted "Event[s] of Default" under the 2014 Loan Documents.  5-ER-889-§8.1.1, 939-§8.1.1.  Thus, when Appellants failed to make a monthly interest payment on time, CAF was permitted to charge a late fee, as liquidated damages, in the amount of 10% of that interest payment.  5-ER-910-§6.2.  Similarly, when Appellants failed to pay off an Advance within 15 days after its maturity date, CAF was permitted (1) to charge a late fee, as liquidated damages, in the amount of 10% of the amount of the Advance; and (2) to charge a default interest rate of 12% (or the highest rate permitted by law) until payment was made.[3]  5-ER-910-§§6.1–6.2.

---

[2] The 2014 Loan Documents permitted CAF to assign rights and obligations to third parties, and defined "Lender" to include CAF and its successors and assigns.  5-ER-868-§1.1, 893-§9.2, 920-§1.1, 943-§9.2.

[3] Appellants are not challenging the provision allowing for default interest to be charged on Advances that Appellants did not pay off on time.  AOB-18-n.3.

### 3. The 2014 Loan Documents authorized CAF to charge, and obligated Appellants to pay, a $250 document processing and lien release fee on each Advance.

CAF collateralized each Advance it issued under the 2014 Loan Documents by recording a security lien on the corresponding property Appellants purchased. 5-ER-981–82; 6-ER-1063, 1158. Thus, to sell one of their CAF-financed properties to a third-party homebuyer, Appellants first had to extinguish CAF's security lien by paying all outstanding interest and fees on, and the full balance of, the applicable Advance. 5-ER-996–98; 6-ER-1064–68.

When Appellants were ready to close on the sale of a CAF-financed property to a homebuyer, they would request a payoff statement from CAF's servicer, Cohen. 5-ER-984–85, 996–98, 1032, 1050; 4-ER-695-¶8. Each payoff statement identified the Advance amount, outstanding interest, and fees Appellants had to pay to discharge their remaining payment obligations to CAF, including a $250 document processing and lien release fee (the "release fee"). 5-ER-996–98; 6-ER-1096–98; 4-ER-695-¶8. The release fee covered the costs of preparing, recording, and tracking the instruments necessary to

9

release CAF's mortgage lien on each property.  4-ER-652–55; 5-ER-982;
6-ER-1064–68, 1072.

Section 3.3 of the 2014 Promissory Notes and Section 10.8 of the
2014 Loan Agreements obligated Appellants to pay the various fees
listed on the payoff statements, including the release fee.  5-ER-908-
§3.3, 953-§3.3.  Consistent with their contractual obligations under
those provisions, Appellants paid the release fee on hundreds of
Advances for the entire duration of the parties' nearly three-year
business relationship, without once objecting that the fee was
unauthorized.  6-ER-1065–68, 1161–62.

> **4.    In October 2015, Najarian Holdings entered into
> a new loan agreement with CAF and, as part of
> that transaction, released all of Appellants' then-
> existing claims against CAF and its successors.**

The 2014 Loan Agreement between Najarian Capital and CAF
had a Maturity Date of August 2015, and the 2014 Loan Agreement
between Najarian Holdings and CAF had a Maturity Date of October 2,
2015.  5-ER-869, 921, 907-§3.1, 952-§3.1.  As of October 1, 2015,
Najarian Holdings entered into a new loan agreement with CAF,
establishing a new credit facility of $15 million (the "2015 Loan
Agreement").  7-ER-1179.  From that date forward, Najarian Holdings

10

had no right to request or obtain any new Advances under its 2014 Loan Agreement. 7-ER-1233-§1(c).

Unlike the 2014 Loan Agreements, the 2015 Loan Agreement was governed by New York law, not California law. 7-ER-1224-§10.22.1. It is undisputed that Appellants did not allege any breaches of the 2015 Loan Agreement, bring any claims arising under it, or allege any violations of New York law. 7-ER-1273–81-¶¶5–6, 11, 17, 25; 5-ER-974–75.

At the same time as, and in conjunction with, the execution of the 2015 Loan Agreement, Najarian Holdings, together with Mr. Najarian personally, entered into the First Amendment to Najarian Holdings's 2014 Loan Agreement. 7-ER-1232. The First Amendment contained a broad and comprehensive general release pursuant to which Najarian Holdings and Mr. Najarian generally and irrevocably released, on behalf of themselves and all of their affiliates, including Najarian Capital, all then-existing known and unknown claims against CAF and its successors, including any claims arising under the 2014 Loan Documents (the "2015 Release" or "Release"). 7-ER-1234–35-§8. Najarian Holdings and Mr. Najarian entered into the Release "in

11

consideration of" CAF's agreement to enter into the 2015 Loan

Agreement.  7-ER-1232.

>    **5.    Appellants received hundreds of Advances from
>         CAF totaling tens-of-millions of dollars, but were
>         chronically late in paying monthly interest
>         payments and repaying matured Advances.**

From 2014 to 2017, Appellants obtained tens-of-millions of dollars

in Advances from CAF to finance their purchases of hundreds of

residential investment properties.  5-ER-964–65; 6-ER-1162.  It is

undisputed that, during this nearly three-year period, Appellants were

in a perpetual state of default because of their consistent failure to

timely pay monthly interest payments and pay off matured Advances,

and routinely admitted fault for their nonpayments.  6-ER-1088, 1094,

1101–02, 1105–06, 1109–11, 1115; 5-ER-1016–19, 1027–28.  Appellants'

recordkeeping during this time frame was inadequate and disorganized,

and Appellants were missing documentation for hundreds of loans.  5-

ER-1051–53, 1056–57; 6-ER-1059.  And the person leading Appellants'

accounting staff was grossly underqualified.  6-ER-1060–62.  It was not

until 2018—after they had ceased doing business with CAF—that

Appellants finally made an effort to correct these problems.  5-ER-

1051–52, 1056–57.

The parties ended their business relationship in May 2017. 5-ER-1033–34. Nearly three years later, in February 2020, Appellants initiated this action in the District Court, 7-ER-1317, alleging that the late fees and release fees they had been charged and had paid pursuant to the 2014 Loan Documents were unlawful or unauthorized.

### B. <u>Summary of Relevant Procedural History</u>

#### 1. Pleadings Stage

Appellants filed their Second Amended Complaint in the District Court on May 4, 2020, asserting claims of (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing (the "implied covenant"); (3) fraud; (4) negligent misrepresentation; (5) unfair competition; (6) "punitive damages;" and (7) "attorney's fees." 7-ER-1304–13. After CoreVest moved to dismiss all of Appellants' claims except their breach of contract claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), the District Court issued an order on July 9, 2020, dismissing with prejudice Appellants' "punitive damages" and "attorney's fees" claims and their breach of implied covenant claim insofar as it "allege[d] conduct superfluous of" Appellants' breach of contract claim, and dismissing with leave to

13

amend Appellants' fraud, negligent misrepresentation, and unfair competition claims.  7-ER-1285, 1299, 1302–03.

Appellants filed their operative Third Amended Complaint on July 30, 2020, asserting claims of (1) breach of contract; (2) breach of the implied covenant; (3) fraud; (4) negligent misrepresentation; and (5) unfair competition.  7-ER-1272–84.  After CoreVest again moved to dismiss pursuant to FRCP 12(b)(6), the District Court issued an order on October 9, 2020, dismissing with prejudice Appellants' fraud, negligent misrepresentation, and unfair competition claims.  7-ER-1254, 1270.

The District Court made clear in its October 9, 2020 order that the "case will proceed on plaintiffs' first claim for breach of contract and second claim for breach of the covenant of good faith and fair dealing to the extent the claim is not duplicative of plaintiffs' first claim." 7-ER-1271.  Both breach claims are premised on the same two theories of liability:  (1) that CAF's late fees were "illegal" liquidated damages under California law (the "late-fee claim"); and (2) that the release fee was not authorized under the 2014 Loan Documents, and thus breached

14

those agreements (the "release-fee claim"). 7-ER-1274–79-¶¶7–22, 1280–81-¶¶25–26.

### 2. Summary Judgment Stage

On September 23, 2021, CoreVest filed a motion for summary judgment on Appellants' (sole-remaining) breach of contract and breach of implied covenant claims. 5-ER-828–57. That same day, Appellants filed a motion for partial summary judgment on liability. 5-ER-806–27. After the parties briefed their respective motions and attended a motion hearing, the District Court issued an order on December 1, 2021, granting CoreVest's motion for summary judgment and denying Appellants' motion for partial summary judgment (the "SJ Order"). 1-ER-5–18. The District Court entered final judgment in CoreVest's favor that same day. 1-ER-4.

In the SJ Order, the District Court reached three principal conclusions. *First*, it held that the 2015 Release barred, and was a complete defense to, both of Appellants' breach claims. 1-ER-13. The District Court reasoned that Appellants had failed to proffer any evidence creating a triable issue of fact with respect to the validity of the 2015 Release, and rejected Appellants' attempts to use parol

15

evidence and Mr. Najarian's subjective intent to try to contradict the Release's unambiguous and express language. 1-ER-12. Further, the District Court rejected Appellants' argument that the 2015 Release contravened public policy by releasing claims under an agreement containing unlawful liquidated damages provisions, explaining that Appellants had failed to establish that the late-fee provisions in the 2014 Loan Agreements were unlawful. 1-ER-12–13.

Additionally, the District Court acknowledged that the Release applied not only to Najarian Holdings, but also to its "affiliates," and held that the uncontroverted evidence presented by CoreVest confirmed that Najarian Capital was in fact Najarian Holdings's affiliate as a matter of law. 1-ER-13. The District Court also found that Appellants' claims were premised solely on the 2014 Loan Documents, and thus fell within the scope of the Release. 1-ER-13.

*Second*, the District Court held that CAF was authorized to charge the release fee under Section 3.3 of the 2014 Promissory Notes and Section 10.8 of the 2014 Loan Agreements, even though the phrase "release fee" did not appear in those provisions. 1-ER-14. The District Court found that it was undisputed that a cost was incurred whenever a

16

lien release was prepared, recorded, and tracked; that Appellants admitted that the release fee was incurred in connection with paying off each Advance; that Appellants and Mr. Najarian understood that the release fee was intended to cover costs for the release of liens and other costs in connection with Appellants' property sales; and that Mr. Najarian's sole frustration with respect to the release fee was that he thought it was too high.  1-ER-14.  In addition, the District Court found that Appellants had offered no authority to suggest that Mr. Najarian's frustration with the amount of the release fee could invalidate the fees charged.  1-ER-14.

For these reasons, the District Court concluded that the plain language of the 2014 Loan Documents did not support Appellants' claim that the release fee was invalid.  1-ER-14.

*Third*, the District Court held that CAF's collection of late fees as liquidated damages was lawful and did not constitute a breach of the 2014 Loan Documents.  1-ER-18.  The District Court found that CAF had "suffered a number of distinct and demonstrable injuries from [Appellants]' chronic late payments," including the loss of use of its money, increased costs of obtaining funding from third parties,

increased investment risk, and having to dedicate increased personnel and resources to managing Appellants' account and ensuring payment of overdue amounts.  1-ER-16.  This evidence, the District Court explained, established "a reasonable foundation for a proportional late charge, one smaller to comport with a tardy installment payment and accordingly larger to match the more substantial difficulties and expenses related to loss of use of [CAF]'s money."  1-ER-16.  And because Appellants had failed to proffer any evidence that the late fees were unreasonable, the District Court held that they had failed to establish that those fees were unenforceable penalties.  1-ER-16.

Moreover, the District Court rejected Appellants' attack on CAF's late fees based on CAF's alleged failure to undertake a "reasonable endeavor" to determine whether the late fees approximated its actual damages.  1-ER-17.  The District Court explained that the reasonable endeavor test for liquidated damages does not require parties to negotiate a liquidated damages amount, and that "the California Supreme Court has long upheld liquidated damages provisions in form contracts where parties exercised their business judgment and determined that damages would be impracticable to estimate."  1-ER-17

18

(citing *Better Food Mkts. v. Am. Dist. Tel. Co.*, 40 Cal. 2d 179, 187 (1953)).

Further, the District Court emphasized that what the reasonable endeavor test requires is "'that a liquidated damages provision must be reasonable in light of the potential harm that could result from a breach, as that harm could be anticipated at the time of contract formation.'" 1-ER-17–18 (quoting *East West Bank v. Altadena Lincoln Crossing, LLC*, 598 B.R. 633, 642 (C.D. Cal. 2019)). The District Court found that the evidence of CAF's increased risks and costs resulting from Appellants' defaults was compelling and precluded a finding of breach with regard to CAF's imposition of late fees. 1-ER-18. Additionally, the District Court found that Appellants had failed to provide any evidence to satisfy their burden of establishing the unreasonableness of the liquidated damages charged, acknowledging that Appellants had not conducted any discovery regarding CAF's intent or practices in calculating or charging late fees. 1-ER-18.

For all of these reasons, the District Court granted CoreVest's motion for summary judgment and denied Appellants' motion for partial summary judgment. 1-ER-18.

### 3. Motion for Attorneys' Fees

On December 15, 2021, CoreVest filed a motion for attorneys' fees pursuant to the 2014 Loan Documents and Cal. Civ. Code § 1717. 2-ER-149–74. After the parties briefed the motion and attended a motion hearing, the District Court issued an order on January 28, 2022, granting the motion and awarding CoreVest attorneys' fees in the amount of $692,079.50. 1-ER-2–3.

### C. <u>Rulings Presented for Review</u>

Appellants' opening brief demonstrates that their appeal from the final judgment is based solely on the SJ Order. AOB-50; *see* 1-ER-5–18. Appellants' opening brief also demonstrates that they are not challenging any portion of the District Court's order granting CoreVest's motion for attorneys' fees; rather, Appellants request reversal of that order only "if this Court reverses the District Court's grant of summary judgment to CoreVest." AOB-50. In other words, Appellants are not independently challenging the reasoning or propriety of the fee award.

## IV.  **SUMMARY OF ARGUMENT**

This Court should affirm the District Court's entry of judgment in CoreVest's favor and the order granting CoreVest's motion for attorneys' fees.

*First*, as is evident from the plain and unambiguous language of the 2015 Release, Najarian Holdings, acting on behalf of itself and its affiliate, Najarian Capital, generally and irrevocably released all claims against CAF and its successors existing as of October 1, 2015, including all claims arising under the 2014 Loan Documents.  The Release, which was part of the consideration Najarian Holdings provided in exchange for CAF's agreement to enter into the 2015 Loan Agreement and create a new $15 million credit facility, is valid, enforceable, and a complete defense to Appellants' claims.  Appellants failed to raise any valid arguments establishing otherwise, and did not proffer evidence sufficient to create a genuine issue of material fact as to enforceability.

*Second*, Appellants' late-fee claim fails as a matter of law because none of the 23 Advances as to which Appellants allege they incurred unlawful late fees arose under or related to the 2014 Loan Documents, and it is undisputed that Appellants are not suing under any other

agreements. Further, Appellants failed to carry their burden, under Cal. Civ. Code § 1671(b), of showing that CAF's late fees were not reasonably related to the range of actual damages the parties could have anticipated would flow from a breach. As explained below, CAF's charging of late fees as a percentage of overdue payment amounts was expressly authorized under Section 6.2 of the 2014 Promissory Notes and was reasonable as a matter of law.

Likewise, Appellants failed to carry their burden of showing that CAF's late fees were not the result of a reasonable endeavor to estimate a fair average compensation. On this point, Appellants misapplied the relevant law and relied on irrelevant evidence that was insufficient to create a genuine issue of material fact or to sustain Appellants' burden of persuasion with respect to their partial summary judgment motion.

*Third*, the plain language of Section 3.3 of the 2014 Promissory Notes and Section 10.8 of the 2014 Loan Agreements authorized CAF to charge the $250 release fee whenever Appellants were paying off an Advance and needed to release CAF's security lien on the corresponding property. The fact that CAF's loan servicer, Cohen, incurred the costs that the release fee covered does not compel a contrary conclusion

22

because, among other reasons, the broad definition of "Lender" in the 2014 Loan Agreements covered Cohen. And even if the Court were to conclude that the 2014 Loan Documents did not expressly obligate Appellants to pay the release fee (and it did), Appellants' regular payment of the release fee for hundreds of Advances forecloses a finding of breach as a matter of law.

For all of the foregoing reasons, the District Court correctly granted CoreVest's summary judgment motion and denied Appellants' partial summary judgment motion. The final judgment and fee order should be affirmed.

## V. <u>ARGUMENT</u>

### A. <u>Standard of Review</u>

An order granting or denying summary judgment is reviewed de novo. *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 447 (9th Cir. 2018); *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1124 (9th Cir. 2002). The same standard that applied in the District Court under FRCP 56(c) governs this Court's review. *Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003). In reviewing rulings on cross-motions for summary judgment, the Court evaluates each motion

separately, "giving the nonmoving party for each motion the benefit of all reasonable inferences." *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 995 (9th Cir. 2017) (internal quotation marks omitted). The Court may affirm summary judgment on any ground supported by the record. *Campidoglio LLC v. Wells Fargo & Co.*, 870 F.3d 963, 973 (9th Cir. 2017).

The meaning of a contract and a district court's interpretation of state contract law also are subject to de novo review. *Los Angeles Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017). The meaning of an unambiguous contract is a question of law. *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014).

### B.   Appellants' claims are barred under the 2015 Release.

#### 1.   The 2015 Release bars Najarian Holdings's claims as a matter of law.

Under California law, release agreements are governed by the same principles of contract interpretation governing contracts generally. *Marder v. Lopez*, 450 F.3d 445, 449 (9th Cir. 2006) (citing *Benedek v. PLC Santa Monica, LLC*, 104 Cal. App. 4th 1351, 1356 (2002)). If there is no evidence of misconduct on the part of the

24

releasee, a release is enforceable according to its terms. *Dubois v. Sparrow*, 92 Cal. App. 3d 290, 298 (1979).

Here, Najarian Holdings and Mr. Najarian entered into the First Amendment as of October 1, 2015. 7-ER-1232. The First Amendment contained the 2015 Release, a broad and comprehensive general release pursuant to which Najarian Holdings and Mr. Najarian fully and irrevocably released "any and all" known or unknown claims against CAF and its successors existing as of October 1, 2015:

> <u>Release</u>. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, [Najarian Holdings] and [Zareh Najarian] . . . , for themselves and on behalf of each and all of their respective . . . affiliates, . . . (individually and collectively, together with the Loan Parties referred to in this Section 8 as [sic], "**Releasor**"), hereby irrevocably and unconditionally agree as follows . . . :
>
> a.      Releasor does hereby fully, forever, and irrevocably release, discharge and

> acquit each of . . . Lender, . . . and . . . [its]
> successors, heirs, and assigns, . . . of and
> from any and all rights, claims, demands,
> obligations, liabilities, indebtedness,
> breaches of contract, . . . cause or causes of
> action, . . . contracts, controversies,
> promises, damages, costs, losses, and
> expenses of every type, kind, nature,
> description or character whatsoever,
> . . . including, without limitation, any and
> all Claims arising from or in connection
> with, or otherwise related to, the Loan,
> Advances under the Loan, and/or the Loan
> Documents, and/or the transactions
> contemplated thereby.

7-ER-1234–35-§8(a).

Under the Release, "Releasor"—collectively defined as Najarian Holdings, Mr. Najarian, and their affiliates, among others, 7-ER-1234-§8—irrevocably agreed to "forever refrain from initiating, filing,

instituting, maintaining or proceeding upon" any released claims.
7-ER-1235-§8(b). The Release provided that it could "be pleaded as a
full and complete defense to . . . any action, suit, or other proceeding
that may be instituted, prosecuted, or attempted in breach of this
Release." 7-ER-1235-§8(e).

The First Amendment defined the term "Loan" as the $5 million
loan evidenced in the 2014 Loan Agreement between CAF and Najarian
Holdings. 7-ER-1232. Additionally, the First Amendment incorporated
by reference the definitions set forth in Najarian Holdings's 2014 Loan
Agreement. 7-ER-1232. Thus, the only reasonable interpretation of the
2015 Release is that it fully and irrevocably released CAF and its
successors, including CoreVest, from any and all claims existing as of
October 1, 2015, "including, without limitation," any and all claims
"arising from or in connection with, or otherwise related to" Najarian
Holdings's 2014 Loan Agreement and 2014 Promissory Note.[4]

As CoreVest explained to the District Court without opposition
from Appellants, *see* 4-ER-557–78, Appellants are suing only for alleged

---

[4] Appellants do not dispute that the Release extends to CoreVest as
CAF's successor, and that CoreVest may seek to enforce the Release.

breaches of the 2014 Loan Documents. Appellants' Third Amended Complaint references only the 2014 Loan Documents and does not mention the 2015 Loan Agreement. 7-ER-1273–74-¶¶5–6. Further, Mr. Najarian—the person who directed the filing of this lawsuit—confirmed at his deposition that Appellants are suing under the 2014 Loan Documents. 5-ER-974–75. And the 2015 Loan Agreement was governed by New York law, not California law. 7-ER-1224-§10.22.1. But Appellants are alleging only violations of California law. *See* 7-ER-1275–81-¶¶11, 17, 25. Thus, the District Court correctly concluded that "[Appellants]' claims are premised solely on the 2014 Loan Documents," 1-ER-13, and thus correctly granted summary judgment on Najarian Holdings's claims based on the Release.

> **2.** **The 2015 Release also bars Najarian Capital's claims as a matter of law, because Najarian Holdings executed the release on behalf of itself and all of its affiliates.**

As noted above, the 2015 Release stated that Najarian Holdings and Mr. Najarian were executing it "for themselves and on behalf of each and all of their respective . . . affiliates," which the Release collectively defined as "Releasor." 7-ER-1234-§8. The District Court

correctly held that Najarian Capital is an affiliate of Najarian Holdings and, therefore, is bound by the 2015 Release. *See* 1-ER-13.

The uncontroverted evidence in the record establishes that (1) Mr. Najarian is the sole member and chief executive officer of both Najarian Capital and Najarian Holdings; (2) Najarian Capital and Najarian Holdings conduct the same business and are essentially the same company; (3) Najarian Capital was in existence when CAF and Appellants began doing business, and Najarian Holdings was a single-purpose entity created solely at CAF's request to create separate credit facilities for the two entities; and (4) both entities share a principal office address and the same registered agent. 5-ER-961–63, 986–87; 6-ER-1165–66, 1168–69. These unrebutted facts establish that Najarian Holdings and Najarian Capital are affiliates under California law, and therefore, that Najarian Capital was a "Releasor" under the 2015 Release and is bound by its terms. *See Otay Land Co., LLC v. U.E. Ltd., L.P.*, 15 Cal. App. 5th 806, 856–57 (2017) (citing Cal. Corp. Code § 150). Underscoring the point, Appellants repeatedly referred to Najarian Holdings and Najarian Capital interchangeably as "Najarian" in their Third Amended Complaint. 7-ER-1273–83-¶¶6–10, 12, 19–33.

Appellants argue that the 2015 Release does not apply to Najarian Capital because Najarian Holdings and Mr. Najarian were the only ones listed in Section 8(f) of the First Amendment as the "owners of all right, title and interest in and to all of the Claims released [t]hereby." 7-ER-1235-§8(f), AOB-32–33. Appellants try to extrapolate this language to mean that the term "Claims" as used in the Release covered only Najarian Holdings and Mr. Najarian. AOB-33.

But Appellants' argument ignores, and indeed, contradicts the plain and unambiguous language of the 2015 Release. The Release defined "Claims" extremely broadly, bringing within its scope

> . . . any and all rights, claims, demands, obligations, liabilities, indebtedness, breaches of contract, . . . cause or causes of action, debts, . . . contracts, controversies, promises, damages, costs, losses, and expenses of every type, kind, nature, description or character whatsoever, and irrespective of how, why, or by reason of what facts, whether heretofore or now existing, or that could, might, or may be claimed to exist, of

30

whatever kind or name, whether known or

unknown, suspected or unsuspected, liquidated or

unliquidated, claimed or unclaimed, whether

based on contract, tort, breach of any duty, or

other legal or equitable theory of recovery . . . .

7-ER-1234–35-§8(a). Thus, the Release was a general release of "any and all" claims that then-existed against CAF and its successors—not just claims arising under Najarian Holdings's 2014 Loan Agreement or belonging to Najarian Holdings. Notably, the Release expressly referenced Najarian Holdings's 2014 Loan Agreement only to confirm that the Release "include[ed], ***without limitation***," claims arising under that agreement. 7-ER-1234–35-§8(a) (emphasis added).

Moreover, Section 8(f) was a specific representation and warranty by Najarian Holdings and Mr. Najarian that they had the right to release the "Claims," and had not previously assigned or conveyed them. 7-ER-1235-§8(f). It would be unreasonable to construe this nonassignment language as intending to limit the scope of the broad release immediately preceding it. Indeed, doing so would rewrite the scope of the Release and limit the definition of "Releasor" solely to

31

Najarian Holdings and Mr. Najarian, even though the definition that the Release actually ascribed to that term was much broader. Such an outcome would contravene California law. Cal. Civ. Code §§ 1638, 1641; *see also Aerojet–Gen. Corp. v. Transp. Indem. Co.*, 17 Cal. 4th 38, 75 (1997) ("We may not rewrite what [the parties] themselves wrote."); *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473 (1998) ("Courts must interpret contractual language in a manner which gives force and effect to every provision, and not in a way which renders some clauses nugatory, inoperative or meaningless." (citing, *inter alia*, *N.Y. Life Ins. Co. v. Hollender*, 38 Cal. 2d 73, 81–82 (1951))).

In short, on its face, the Release broadly covered any claim Najarian Holdings or any of its affiliates could have asserted against CAF as of October 1, 2015. To the extent Appellants argue to the contrary, their proffered interpretation ignores the express definition of "Claims" in the release and runs afoul of California law.

Appellants also argue that Najarian Capital is not bound by the 2015 Release because it did not receive any consideration for it. AOB-33–34. But California law does not require consideration in exchange

for a release of claims. Cal. Civ. Code § 1541; *Crow v. P.E.G. Constr. Co.*, 156 Cal. App. 2d 271, 277 (1957) ("[W]here the writing is plain and explicit and given for the express purpose of effecting a complete release of the obligation, a consideration is not necessary.")

Furthermore, whether the First Amendment satisfied contract-formation elements as to Najarian Capital is irrelevant. The First Amendment was not, and need not have been, a contract between CAF and Najarian Capital for the Release to operate against the latter. Rather, by entering into the Release on its own behalf and on behalf of Najarian Capital, Najarian Holdings caused the Release to bind Najarian Capital as a matter of law. *Bd. of Trustees v. Agilent Techs., Inc.*, No. 18-cv-01199-VC, 2019 WL 4729602, at *1 (N.D. Cal. Aug. 13, 2019) ("As an entity affiliated with Agilent at the time of signing, HP is bound by the release." (citing Cal. Civ. Code § 1644)). "Any other interpretation would render the inclusion of 'affiliates' completely meaningless and thus superfluous." *Thomas v. Cricket Wireless, LLC*, 506 F. Supp. 3d 891, 902 (N.D. Cal. 2020). This must be avoided. *City of Atascadero*, 68 Cal. App. 4th at 473.

33

### 3. Appellants have not raised any valid arguments against the enforceability of the 2015 Release.

#### a. The Release is enforceable even though it does not bear CAF's signature.

Appellants argue that the 2015 Release is invalid and unenforceable because CAF did not sign the First Amendment. AOB-27–28. This argument fails for the following independent reasons.

*First*, Appellants failed to raise this argument in the District Court, *see* 4-ER-493–508, 557–78, thereby waiving it. *Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014) (citing *Komatsu, Ltd. v. States S.S. Co.*, 674 F.2d 806, 812 (9th Cir. 1982)).

*Second*, the First Amendment was entered into at the same time, by the same parties, and as part of the same transaction as the 2015 Loan Agreement. 7-ER-1174–75-¶¶11–12, 1179, 1232. Further, the 2015 Loan Agreement and First Amendment expressly referenced each other and stated that they were executed "[c]oncurrently" on the same date. 7-ER-1186, 1232. And the First Amendment expressly provided that Najarian Holdings and Mr. Najarian were executing the Release in the First Amendment "in consideration of," among other things, CAF's agreement to establish the new credit facility set forth in the 2015 Loan

34

Agreement. 7-ER-1232. Thus, the First Amendment and 2015 Loan Agreement must be read together as part of one transaction. Cal. Civ. Code § 1642 ("Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together.").[5]

This is significant because both Najarian Holdings and CAF signed the 2015 Loan Agreement. 7-ER-1227–28. And both parties subsequently performed it, given that CAF continued advancing loans well into 2017 and charged the 5% late fee authorized under the 2015 Loan Agreement, instead of the 10% late fee authorized under the 2014 Loan Documents. AOB-10, 24; *see* 5-ER-910-§6.2; 7-ER-1192-§2.5.6. Accordingly, the omission of CAF's signature from the First Amendment is meaningless, because both parties signed the principal 2015 Loan Agreement.

Section 10.5 of the 2014 Loan Agreements (the so-called "integration clause," AOB-27) does not compel a contrary conclusion.

---

[5] The same would hold true under New York law, which governed the 2015 Loan Agreement. *See Nau v. Vulcan Rail & Constr. Co.*, 36 N.E.2d 106, 110 (N.Y. 1941), *cited with approval in TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 89 (2d Cir. 2005).

The final portion of Section 10.5 provided that no amendment of the 2014 Loan Documents would be valid unless in writing and signed by CAF.  5-ER-894-§10.5, 944-§10.5.  This requirement was obviously intended to protect *CAF*, not Appellants, because it did not require that amendments be signed by all "parties."  Indeed, that is the only reasonable interpretation of this language when read in the context of the remainder of Section 10.5, which afforded CAF other rights and protections.  5-ER-894-§10.5, 944-§10.5; *see* Cal. Civ. Code § 1641.

*Third*, Appellants' reliance on Section 2(a) of the First Amendment, AOB-27, is misplaced.  Although Section 2(a) required that the Amendment be "duly executed and delivered by each of the parties herein," it bestowed upon CAF "***sole and absolute discretion***" to determine whether that provision had been satisfied.  7-ER-1233-§2(a) (emphasis added).  Thus, Section 2(a) also was intended to protect CAF, not Appellants.  And because Najarian Holdings and Mr. Najarian signed the First Amendment and the parties subsequently performed it along with the 2015 Loan Agreement, it is reasonable to infer that CAF exercised its discretion and determined that the signature condition had been satisfied.

36

*Fourth*, Appellants contend that the First Amendment is invalid under the Statute of Frauds (which they erroneously refer to as "the parol evidence rule" in a heading) because CAF did not sign the First Amendment. AOB-28–30. This argument has no merit.

Again, Appellants did not assert this argument in the District Court, *see* 4-ER-493–508, 557–78, thus waiving it. *Armstrong*, 768 F.3d at 981; *see also French v. Bank of New York Mellon*, 729 F.3d 17, 22 n.2 (1st Cir. 2013) (holding that the plaintiff's Statute of Frauds argument was waived because he raised it for the first time on appeal); *accord Laserage Tech. Corp. v. Laserage Labs., Inc.*, 972 F.2d 799, 804 (7th Cir. 1992); *Barnwell & Hays, Inc. v. Sloan*, 564 F.2d 254, 256 (8th Cir. 1977).

Moreover, California law provides that "the fact that a party to a contract has not signed the written document invalidates it only with regard to the statute of frauds and enforcing the agreement ***against that particular party***." *Far West Servs., Inc. v. Livingston*, 156 Cal. App. 3d 931, 939 (1984) (emphasis added); *see also Steel v. Duntley*, 115 Cal. App. 451, 452 (1931) ("The party to be charged is the only one who must sign."); *accord Cavanaugh v. Casselman*, 88 Cal. 543, 548–49

37

(1891).  This principle is embodied in the text of the statute itself:  a contract governed by the Statute of Frauds is invalid unless it "or some note or memorandum thereof . . . [is] in writing ***and subscribed by the party to be charged or by the party's agent***."  Cal. Civ. Code § 1624(a) (emphasis added).

Here, it is undisputed that Najarian Holdings and Mr. Najarian ***did*** sign, and thus ***did*** subscribe to, the First Amendment.  7-ER-1237.  Thus, assuming it applies, the Statute of Frauds has been satisfied.

The lone case Appellants cite to support their Statute of Frauds argument actually supports CoreVest's position.  In *Secrest v. Security National Mortgage Loan Trust 2002-2*, 167 Cal. App. 4th 544 (2008), the California Court of Appeal reiterated that "[u]nder Civil Code section 1624, the party to be charged means the party to be charged in court with the performance to the obligation."  *Id*. at 552 (internal quotation marks omitted).

Finally, Appellants offer no legal or factual support for their argument that the Statute of Frauds applies in the first place.  They state that the First Amendment "purports to modify" CAF's deeds of trust, AOB-28–29, but they cite no evidence to support this assertion.

Further, because *Secrest* held that a forbearance agreement is subject to the Statute of Frauds when it modifies a promissory note and deed of trust, Appellants erroneously characterize the First Amendment as a "forbearance agreement." AOB-26. But the First Amendment merely extended the maturity dates of Najarian Holdings's Advances and Loan in exchange for payment of extension fees totaling $16,954.24. 7-ER-1233-§2(c). Appellants present no legal authority or evidence supporting their assertion that CAF's agreement to extend loan maturity dates in exchange for payment constituted a "forbearance agreement" or otherwise modified CAF's deeds of trust. Thus, Appellants have not established that the Statute of Frauds applies.

### b. Enforcement of the Release has nothing to do with "future claims."

Appellants argue that the District Court erred in granting summary judgment based on the 2015 Release because neither Najarian Holdings nor Najarian Capital released "future claims" of breach of contract, i.e., claims premised on events occurring after the Release's October 1, 2015 effective date. AOB-30–32. Appellants never raised this issue in the District Court, *see* 4-ER-493–508, 557–78, thereby waiving it. *Armstrong*, 768 F.3d at 981.

39

Even if the Court considers Appellants' argument, their argument fails. CoreVest has never argued that the Release applies to "future claims." *See* 4-ER-478–84, 521–22; 5-ER-843–845. Nor does CoreVest need to do so to invoke the Release.

Appellants' late-fee claim is premised on the central allegation that the late fees were "illegal" liquidated damages under California law and were "unreasonable at the time each contract at issue was entered into by the parties." 7-ER-1275–76-¶11. Likewise, Appellants' release-fee claim is premised on the central allegations that CoreVest was never authorized to charge the "illegal" release fee, and breached the 2014 Loan Documents when it charged the fee on Advances it issued under those agreements. 7-ER-1279–81-¶¶19, 26. Thus, Appellants' breach of contract and breach of implied covenant claims accrued before October 1, 2015 with respect to both the late-fee and release-fee theories of liability. *Whorton v. Dillingham*, 202 Cal. App. 3d 447, 456 (1988). The requirement that the reasonableness of a liquidated damages provision be determined based on "the circumstances existing at the time the contract was made," Cal. Civ. Code § 1671(b), bolsters this conclusion.

Accordingly, because Appellants' breach of contract and breach of implied covenant claims necessarily had accrued by the time the 2015 Release was executed, the Release barred them. Thus, invoking the Release does not implicate "future claims."

As part of their "future claims" argument, Appellants contend that even if the 2015 Release is enforceable, it did not cover the 57 Advances originally issued under the 2014 Loan Documents that were extended under the First Amendment. AOB-31. Appellants state that "CAF charged Release Fees when all of those loans closed and late fees in connection with many (and perhaps all) of those advances after the effective date of the First Amendment." AOB-31 (emphasis omitted). And they claim that, as a result, "many of the breaches of contract alleged in this proceeding did not occur" until after the First Amendment was executed, i.e., "accrued in the future," and thus could not have fallen within the scope of the 2015 Release. AOB-30.

This entire line of argument is speculation and conjecture, as evidenced by the absence of even a single citation to the evidentiary record—a clear violation of FRAP 28(a)(8)(A). Simply put, there is no evidence that any of the 57 Advances identified in the First Amendment

41

incurred late fees. And there is no evidence as to if and when release fees were charged on those Advances.

Notably, Summer Greer, one of Appellants' corporate designees under FRCP 30(b)(6), testified that all of the late fees Appellants are challenging in this action are identified on a spreadsheet she prepared during the pendency of the case (the "Greer Spreadsheet"). 4-ER-544–45, 551–52. The Greer Spreadsheet identifies only 23 Advances as to which Appellants are claiming they were assessed unlawful late fees—16 Advances made to Najarian Holdings and seven Advances made to Najarian Capital.[6] 4-ER-555–56. Not a single one of the Advances on the Greer Spreadsheet appears on the schedule of 57 Advances that the First Amendment extended. *Compare* 4-ER-555–56, *with* 7-ER-1239. This directly contradicts and defeats Appellants' speculation that "many (and perhaps all)" of the alleged breaches of contract occurred after the First Amendment's execution. AOB-31.

---

[6] CoreVest's motion papers and deposition questions in the District Court inadvertently referenced 24 Advances, but the correct number is 23 Advances—16 issued to Najarian Holdings, and the remaining seven to Najarian Capital. 4-ER-555–56.

Finally, Appellants argue that only those "future claims" that "rel[ied] upon the identical factual predicate as the released claims" were barred by the" 2015 Release. AOB-32 (emphasis omitted). Even if "future claims" were at issue here (and they are not), the Third Amended Complaint confirms that all of the allegedly unlawful late fees and release fees were based on the same factual predicate. *See* 7-ER-1274–78-¶¶7–18.

> ### c.  *Appellants' "public policy" arguments have no merit and do not preclude enforcement of the Release.*

Appellants argue that the 2015 Release contravenes public policy because it released claims under an agreement containing allegedly "illegal" liquidated damages provisions. AOB-34–36. But in making this argument, Appellants simply assume that the late-charge provisions in the 2014 Loan Agreements were "illegal." But the District Court rejected this proposition. 1-ER-12–13, 15–18. And in any event, the late-charge provisions are lawful under California law for the reasons set forth in Part V.C below.

Further, Appellants' case authorities do not support their public-policy argument and do not apply to the facts of this case. For example,

in *Graylee v. Castro*, 52 Cal. App. 5th 1107 (2020), the court refused to enforce a stipulated judgment that charged the tenant plaintiffs $28,970 for being several hours late moving out, because the charge bore no relationship to the range of anticipated damages from the breach of the stipulation. *Id.* at 1110. And in *Hardwick v. Wilcox*, 11 Cal. App. 5th 975 (2017), the court affirmed the invalidity of a release that waived claims pertaining to usurious loans as perpetuating a violation of usury laws. *Id.* at 978, 985. Both cases are inapposite because they involved issues and reached conclusions that have no bearing on this action.

As an afterthought, Appellants state in passing—without evidence or analysis—that the 2015 Release was "executed without benefit of counsel." AOB-36. Although Appellants do not cite any evidence in support of this argument, they made a similar argument in the District Court based on the conclusory (and largely inadmissible) declaration testimony of Mr. Najarian. *See* 4-ER-566, 580-¶4. To the extent Appellants are making a similar argument here, the argument fails.

The 2015 Release contains an express acknowledgment that "[Releasor] has had full opportunity to review th[e] Amendment,

44

including th[e] Release, with its legal counsel and fully understands all of the terms and provisions hereof, and is fully aware of its content and legal effect." 7-ER-1235-§8(e). Mr. Najarian made a similar representation when he signed the concurrently executed 2015 Loan Agreement on behalf of Najarian Holdings. 7-ER-1224-§10.20. These provisions are binding on Appellants, and they cannot now try to alter or contradict them, years after the First Amendment was executed, using declaration testimony. *Winet v. Price*, 4 Cal. App. 4th 1159, 1167–68 (1992); *see, e.g.*, *United States v. Sardie*, 191 F. Supp. 2d 1128, 1134 (C.D. Cal. 2000) (rejecting a releasor's attempt to contradict the language of a release through declaration testimony).

Lastly, Appellants argue that the enforceability of a release is a question of fact. AOB-36–37. Appellants are wrong again. Where, as here, a contractual release is unambiguous, its interpretation and enforceability is a question of law. *Cohen v. Five Brooks Stable*, 159 Cal. App. 4th 1476, 1483 (2008).

45

**C.** **Appellants' late-fee claim fails as a matter of law because none of the challenged late fees arose under the 2014 Loan Documents, and Appellants failed to carry their statutory burden of rebutting the presumed reasonableness of those fees.**

**1.** **None of the Advances as to which Appellants allege they were charged unlawful late fees arose under the 2014 Loan Documents.**

As noted above, the only Advances as to which Appellants allege they were assessed unlawful late fees are those set forth in the Greer Spreadsheet. 4-ER-544–45, 551–52, 555–56. Each of the 23 Advances identified in the Greer Spreadsheet bears a "Loan Date" after the October 1, 2015 effective date of the 2015 Loan Agreement and 2015 Release. 4-ER-555–56. Thus, none of those Advances could have been made under the 2014 Loan Documents. As noted above, Najarian Capital's 2014 Loan Agreement had a Maturity Date of August 2015. 5-ER-921, 952-§3.1. And although the First Amendment extended the Maturity Date of Najarian Holdings's 2014 Loan Agreement, it also stated that Najarian Holdings had no right to obtain further Advances under that agreement after October 1, 2015. 7-ER-1233-§§1(b)–(c).

Accordingly, because Appellants are suing only for breaches of the 2014 Loan Documents, 7-ER-1273–74-¶¶5–6; 5-ER-974–75, the Greer

46

Spreadsheet confirms that the Advances tied to the challenged late fees were not issued under the agreements in dispute. This conclusion is underscored by the fact that Appellants allege in this case that they were charged a 5% late fee, not the 10% late fee authorized under the 2014 Loan Documents. AOB-10, 24; *see* 5-ER-910-§6.2; 7-ER-1192-§2.5.6.

> **2.    Appellants failed to carry their burden of rebutting the presumed reasonableness of CAF's late fees.**

Under California law, a liquidated damages provision is enforceable if (1) it bears a "reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach," and (2) the amount set as liquidated damages "represent[s] the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 977 (1998) (internal quotation marks omitted). Conversely, "[t]he characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract." *Id.* (internal quotation marks omitted). In the lending context specifically, a

47

liquidated damages provision is a penalty if "the sum extracted from the borrower is designed to exceed substantially the damages suffered by the lender," and "its primary purpose is to compel prompt payment through the threat of imposition of charges bearing little or no relationship to the amount of the actual loss incurred by the lender." *Id.* at 981 (internal quotation marks omitted).

The party challenging a liquidated damages provision bears the burden of proving that it is unenforceable. Cal. Civ. Code § 1671(b); *Weber, Lipshie & Co. v. Christian*, 52 Cal. App. 4th 645, 654 (1997); *Valenzuela v. ADT Sec. Servs., Inc.*, 475 F. App'x 115, 117 (9th Cir. 2012) (applying Cal. Civ. Code § 1671(b)); *see also* AOB-16–17. The enforceability of a liquidated damages provision is a question of law to be decided by the court. *Dollar Tree Stores Inc. v. Toyama Partners LLC*, 875 F. Supp. 2d 1058, 1071 (N.D. Cal. 2012) (citing *Harbor Island Holdings v. Kim*, 107 Cal. App. 4th 790, 794 (2003)).

> a.   *Appellants failed to show that there is no reasonable relationship between CAF's late fees and the range of actual damages the parties could have anticipated would flow from a breach.*

Appellants contend that CAF's late fees were unlawful because they did not bear a reasonable relationship to CAF's actual damages. AOB-22–24.  Appellants have failed to carry their burden on this point for at least three independent reasons.

*First*, Appellants represent that it is "settled law" that a late fee charged as a percentage of the loan principal is "*per se* prohibit[ed]" and cannot bear a reasonable relationship to the range of actual damages, regardless of the circumstances.  AOB-23.  That is not the law; no per se prohibition exists.

In support of their argument, Appellants cite *Greentree Financial Group, Inc. v. Execute Sports, Inc.*, 163 Cal. App. 4th 495 (2008).  In *Greentree*, the parties settled a $45,000 dispute for $20,000, payable in two installments of $15,000 and $5,000.  *Id.* at 498.  Even though the settlement amount was $20,000, the settlement agreement provided that if the defendant defaulted on either installment payment, the plaintiff could file a stipulated judgment in the full amount of the plaintiff's original claim ($45,000), plus prejudgment interest, attorneys'

fees, and costs. *Id.* After the defendant failed to make the $15,000 installment payment, the plaintiff sought and obtained entry of a judgment in the amount of $61,232.50, consisting of $45,000 in damages, $13,912.50 in prejudgment interest, $2,000 in attorneys' fees, and $320 in costs. *Id.*

The California Court of Appeal held that the stipulated judgment amounted to an unlawful penalty and reversed the judgment. *Id.* at 501. The court reasoned that the $61,232.50 judgment was not reasonably related to the range of actual damages the parties could have anticipated would flow from the breach of a $20,000 settlement, considering that "[t]he amount of the judgment . . . was more than triple" the settlement amount. *Id.* at 500–01. In this respect, the amount of the judgment "[did] not merely compensate [the plaintiff]—it reward[ed the plaintiff] by penalizing [the defendant]." *Id.* at 500.

As is readily apparent from *Greentree*'s factual scenario, holding, and rationale, that decision does not even reference, let alone create or apply, a per se prohibition on late fees charged as percentages of overdue payments. Nor does it hold that such fees are improper when

the full loan balance itself is the overdue payment amount, as was the case when CAF charged late fees on matured Advances.

*Second*, what California law ***actually*** prohibits is charging a late fee as a percentage of the outstanding loan balance when the borrower misses an ***installment payment***.  For example, *Ridgley* held that the imposition of a "prepayment fee" in the form of six months' interest on the principal loan balance did not bear a reasonable relationship to damages result from a single late installment payment, and thus constituted an unenforceable penalty.  17 Cal. 4th at 981.  And in *Garrett v. Coast & Southern Federal Savings & Loan Association*, 9 Cal. 3d 731 (1973), *superseded by statute on other grounds as stated in Weber*, 52 Cal. App. 4th at 654, the court held that a late charge in the form of a 2% default interest rate assessed on the entire unpaid loan balance was unlawful when the missed payment was only a monthly installment payment.  *Id.* at 740.  The court explained that "a charge for the late payment of a loan installment which is measured against the unpaid balance of the loan must be deemed to be punitive in character." *Id.*

Here, by contrast, there is no evidence that CAF calculated and charged late fees on missed monthly interest (installment) payments based on the Advance amounts. Rather, as Mr. Najarian testified, CAF charged two types of late fees: one for late interest payments, and another for late repayment of matured Advances. 5-ER-1001–02. When Appellants failed to make a timely interest payment, they were charged small late fees that as percentages of the missed interest payments, not the underlying Advance amounts. *See, e.g.*, 6-ER-1096–98 (reflecting $42.04 in late fees for an Advance with a principal balance of $71,750, $23.51 in late fees for an Advance with a principal balance of $68,600, and $23.89 in late fees for an Advance with a principal balance of $69,705.64). Appellants' 30(b)(6) witness, Kyle Dudley, confirmed that Appellants are not claiming that CAF charged late fees on missed monthly payments as percentages of the corresponding Advance amounts. 5-ER-1044–46.

Nevertheless, Appellants argue in their opening brief that the 2014 Promissory Notes "provide[d] for late fees set as a percentage of the ***outstanding debt due***, whether a monthly interest payment or the full outstanding debt due at the maturity of" each Advance. AOB-24

52

(emphasis added). But that is not what the 2014 Promissory Notes provided. Rather, they permitted the imposition of a late fee only as a percentage of "the amount *of such unpaid payment* or deposit." 5-ER-910-§6.2 (emphasis added).

The lone item of evidence Appellants cite in support of their position—an e-mail from CAF representative Stephanie Casper to Mr. Najarian dated February 2017 (after the 2014 Loan Documents were no longer effective)—confirms that CAF was charging two types of late fees: (1) late fee calculated as percentages of the amounts of matured Advances that Appellants failed to pay off on time ("$56,000 or so"); and (2) late fees calculated as percentages of the monthly interest payments Appellants failed to pay on time ("Roughly $14K" in "interest late pays"). 5-ER-804.

*Third*, as the District Court concluded, 1-ER-17, Appellants failed to adduce any evidence showing that CAF's late fees did not bear a reasonable relationship to the range of its actual damages. Likewise, Appellants did not proffer any evidence that the late fees on overdue Advances were intended to coerce compliance with the 2014 Loan Documents or designed to substantially exceed CAF's damages, or that

CAF's primary purpose in charging late fees was to compel Appellants' prompt payment through the threat of imposing charges bearing little or no relationship to its actual losses. In short, Appellants do not possess even a scintilla of evidence to sustain their burden of showing that CAF's late fees were designed to do anything other than to compensate it for harm caused by Appellants' defaults.

By contrast, CAF proffered uncontroverted evidence establishing that its late fees were intended to compensate it for injuries resulting from borrowers' late payments. CoreVest's witnesses testified that Appellants' chronic late payments caused CAF to suffer distinct and demonstrable injuries, including: (1) a much higher risk of nonpayment of the loan principles and interest, which gave rise to a substantially heightened risk of foreclosure and, in turn, lowered the value of CAF's loans; (2) increases in the rates at which CAF could access credit lines used to fund loans to borrowers like Appellants; (3) loss of use of the funds due; and (4) increased costs of servicing and managing Appellants' loans, given that CAF had to dedicate more personnel and resources to address Appellants' defaults and negotiate prompt payment of outstanding balances. 7-ER-1172–74-¶¶4–9; 6-ER-1075–78.

54

Unable to rebut these facts, Appellants now try to characterize them as "post-hoc rationalizations" that are the product of analyses performed after the 2014 Loan Agreements.  AOB-17–19.  This is yet another argument Appellants failed to raise in the District Court and waived.  *Armstrong*, 768 F.3d at 981.  Regardless, the mere fact that relevant evidence regarding CAF's damages was conveyed in testimony given during the pendency of this litigation—and thus necessarily after the 2014 Loan Documents were executed—does not mean that CoreVest had not previously identified or analyzed its injuries.

For this reason, *Hitz v. First Interstate Bank*, 38 Cal. App. 4th 274 (1995), is inapplicable.  In *Hitz*, actual evidence presented in the case confirmed that the bank had not performed a cost analysis until after the contract containing the liquidated damages provision had been executed.  *Id.* at 291–92.  No such evidence exists here.  In fact, as explained in Part V.C.2.b below, CoreVest expressly denied that CAF had not considered actual losses such as costs of collecting overdue loan payments before entering into the 2014 Loan Documents.  4-ER-626, 637.

> b. *Appellants also failed to show that CAF's late fees were not the result of a reasonable endeavor by the parties to estimate a fair average compensation.*

Appellants argue that the late fees they incurred were not reasonable liquidated damages because CAF did not endeavor to approximate and negotiate the actual damages Appellants' late payments would cause before entering into the 2014 Loan Documents. AOB-15–20. As the District Court correctly concluded, Appellants' argument contradicts well-established case law holding that a late fee is lawful so long as it is reasonable in light of the harm anticipated at the time of contract formation. 1-ER-17–18. Further, if adopted, Appellants' argument would impose extreme burdens on lenders who seek to charge reasonable late fees when borrowers default on payments and cause compensable injuries.

As an initial matter, the cases Appellants cite merely articulate the general rule that a liquidated damages provision should be the result of a reasonable endeavor to approximate fair compensation for damages sustained. *See, e.g.*, AOB-17 (citing *Ridgley*, 17 Cal. 4th at 977, and *Garrett*, 9 Cal. 3d at 740). But courts applying those authorities have explained that the "reasonable endeavor" requirement

56

should not be read to require that the provision

be the subject of actual negotiation by the parties

prior to contract formation. . . .  There is no

requirement that the parties negotiate a

liquidated damages provision for it to be

enforceable; instead, the "reasonable endeavor"

requirement means only that a liquidated

damages provision must be reasonable in light of

the potential harm that could result from a

breach, as that harm could be anticipated at the

time of contract formation.

*Altadena*, 598 B.R. at 641–42 (citing *Better Food Mkts.*, 40 Cal. 2d at

187); *accord Util. Consumers' Action Network, Inc. v. AT&T Broadband

of S. Cal., Inc.*, 135 Cal. App. 4th 1023, 1035 (2006); *In re 3MB, LLC*,

609 B.R. 841, 854 (E.D. Cal. 2019).

Rather, "the intent to estimate a just compensation for the loss

from a breach is determined by looking at the 'entire agreement, its

scope, purpose, and subject matter, and considering the result of a

breach and the reasonableness of the sums agreed to be paid therefor.'"

57

*Action Network*, 135 Cal. App. 4th at 1037 (quoting *Dyer Bros. Golden W. Iron Works v. Cent. Iron Works*, 182 Cal. 588, 593 (1920)). In other words, "[d]espite th[e] 'reasonable endeavor' language, the ultimate question regarding enforceability focuses on the ***substantive reasonableness*** of the liquidated damages provision rather than on the process of contract formation that gave rise to the provision." *Altadena*, 598 B.R. at 642 (emphasis added).

For this reason, Appellants' reliance on CoreVest's responses to certain requests for admission ("RFAs") is misplaced. Appellants argue that CoreVest admitted that CAF never analyzed the damages it would suffer from borrower defaults before executing the 2014 Loan Documents, and thus never conducted a reasonable endeavor. AOB-15–16. But in making this argument, Appellants mischaracterize both the scope of the applicable RFAs and the nature of CoreVest's responses.

As is evident on the face of the six RFAs, five of them (Nos. 1, 4, 6, 10, and 11) concerned different types of damages analyses pertaining ***only to Appellants***. 4-ER-620–28, 631–39. Consistent with the authorities discussed above, CoreVest responded that it had no

58

obligation to perform the Appellants-specific analyses, and thus had not performed them.[7] 4-ER-620–28, 631–39.

But at no time did CoreVest state in its RFA responses that CAF had never performed a general analysis of the types of damages it suffered when borrowers defaulted on interest payments and payoffs. In fact, in response to RFA No. 9, which Appellants do not mention in their brief, CoreVest expressly ***denied*** that CAF had not considered its "costs of collection of loan payments not timely paid by borrowers other than [Appellants] . . . when [CAF] drafted the [2014 Loan Documents]." 4-ER-626, 637.

In short, the fact that CAF did not estimate or negotiate the actual damages it would incur from breaches of the 2014 Loan Documents specifically is irrelevant and immaterial. CAF was not required to engage in a borrower-specific damages analysis or negotiation, and its late fees were lawful because they were reasonable

---

[7] Only one of the six RFAs (No. 5) referenced parties other than Appellants, but in that request, Appellants inquired about "actual losses" caused by "borrowers situated similarly to [Appellants]." 4-ER-623, 634–35. The reasonable-endeavor requirement is concerned only with ***anticipated*** damages, not actual damages. *Ridgley*, 17 Cal. 4th at 977.

under the circumstances. *Better Food Mkts.*, 40 Cal. 2d at 187; *Action Network*, 135 Cal. App. 4th at 1035; *In re 3MB, LLC*, 609 B.R. at 854; *Altadena*, 598 B.R. at 641–42.

Appellants have not cited any authority to the contrary. Indeed, any rule requiring lenders to estimate in advance damages flowing from every new borrower's potential breach of every new lending agreement would turn the lending industry on its head. Not only would such a rule impose extreme burdens on lenders, but it would essentially chill their right to use lawful liquidated damages provisions in agreements with borrowers. That is why the California Supreme Court has explained that a liquidated damages provision does not violate Section 1671(b) "where it is established that the measure of actual damages would be a comparatively small amount and that it would be economically impracticable in each instance of a default to require a lender to prove to the satisfaction of the borrower the actual damages by accounting procedures." *Garrett*, 9 Cal. 3d at 741–42.

Finally, CAF's late fees were substantively reasonable because (1) Appellants were sophisticated entities with significant bargaining power when they entered into the 2014 Loan Documents, 5-ER-990; and

60

(2) they specifically recognized that CAF would "incur additional expenses as a result of any late payments or deposits [t]hereunder, which expenses would be impracticable to quantify," and expressly agreed that a 10% late fee was "a reasonable estimate of such expenses," 5-ER-910-§6.2. *See Weber*, 52 Cal. App. 4th at 654–55.

**D.** **Appellants were obligated to pay a $250 release fee each time they paid off an Advance they had received from CAF.**

**1.** **The 2014 Loan Documents expressly obligated Appellants to pay the release fee.**

Under California law, the meaning of a contract is a question of law unless the contract "is ambiguous and there is conflicting extrinsic evidence from which a jury could resolve the ambiguity in favor of either party." *Alexander*, 765 F.3d at 988 (internal quotations omitted). When "'the language [of the contract] is clear and explicit, and does not involve an absurdity,'" that language governs the contract's interpretation. *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010) (alteration omitted) (quoting Cal. Civ. Code § 1638).

61

   a.   *The first sentence of Section 3.3 of the 2014*
        *Promissory Notes obligated Appellants to pay*
        *the release fee.*

It is undisputed that Section 3.3 of the 2014 Promissory Notes and

Section 10.8 of the 2014 Loan Agreements obligated Appellants to pay

various fees and costs. Appellants argue, however, that those sections

did not authorize CAF to charge the $250 release. Appellants are

wrong.

Section 3.2 of the 2014 Promissory Notes obligated Appellants to

pay, as additional consideration for each Advance, 2% of the amount of

each Advance as a "Cash Advance Fee." 5-ER-907–08-§3.2, 952–53-

§3.2. The first sentence of Section 3.3, which immediately followed

Section 3.2, provided that Appellants "shall pay to Lender all other

fees"—i.e., all fees other than the Cash Advance Fee—"as and when

required pursuant to the Loan Documents." 5-ER-908-§3.3, 953-§3.3.

Thus, when read together, Sections 3.2 and 3.3 of the 2014 Promissory

Notes obligated Appellants to pay a Cash Advance Fee for each

Advance, and all other fees required by the 2014 Loan Documents.

The term "Loan Documents" in the 2014 Promissory Notes

encompassed all documents defined as "Loan Documents" in the 2014

62

Loan Agreements. 5-ER-907-§1, 952-§1. In turn, the 2014 Loan Agreements defined "Loan Documents" broadly to include, among other things, all "documents or instruments now or hereafter evidencing . . . or otherwise executed in connection with the Obligations or any and all Advances made" under the 2014 Loan Agreements. 5-ER-869, 921. "Obligations" encompassed all of Appellants' obligations under the 2014 Loan Documents, including all "Indebtedness," defined in relevant part as "all indebtedness . . . for borrowed money." 5-ER-868–69, 920–21. Accordingly, under the first sentence of Section 3.3, Appellants were obligated to pay (1) *all* fees (2) as and when required under any document or instrument (3) thereafter evidencing or executed in connection with (4) Appellants' indebtedness for borrowed money or any Advances made to them.

The payoff statement was one such document or instrument. Appellants requested and received payoff statements whenever they were ready to close on the sale of a CAF-financed property to a third-party homebuyer. 5-ER-996–98, 1032, 1050; 4-ER-695-¶8. Each payoff statement identified the full Advance amount, outstanding interest, and fees that Appellants had to pay to terminate each Advance. 6-ER-1096–

63

98; 5-ER-996–98; 4-ER-695-¶8.  Thus, the payoff statements evidenced

Appellants' indebtedness and were executed in connection with the

Advances.  In other words, they constituted "Loan Documents" under

the plain language of the definition that the 2014 Loan Documents

attached to that term.  Accordingly, under the first sentence of Section

3.3, the payoff statements obligated Appellants to pay the $250 release

fee on each Advance.

> b.    *The second sentence of Section 3.3 of the 2014*
> *Promissory Notes, and Section 10.8 of the 2014*
> *Loan Agreements, also obligated Appellants to*
> *pay the release fee.*

The second sentence of Section 3.3 required Appellants to "pay to

Lender, on or prior to closing of the Loan, all closing costs and other fees

and expenses incurred by Lender in connection with the Loan

(including appraisal fees, title insurance premiums, escrow fees,

recording fees, cost review and legal fees), as more particularly set forth

in Section 10.8 of the Loan Agreement."  5-ER-908-§3.3, 953-§3.3.  In

turn, Section 10.8 of the 2014 Loan Agreements, titled "Payment of

Expenses," obligated Appellants to

> pay on demand all costs and expenses of Lender
>
> in connection with the . . . preparation, execution,

delivery, administration, . . . and enforcement of

the Loan Documents and any workouts or other

matter related thereto and any litigation or

dispute with respect thereto (including, without

limitation, any bankruptcy or similar proceeding),

including, without limitation, attorneys' fees and

disbursements and fees and costs of any

consultants to Lender.  This Section 10.8 shall

survive closing of the Loan and repayment

thereof.

5-ER-894-§10.8, 944-§10.8.

It is undisputed that the release fee covered the costs of preparing,

recording, and tracking the instruments necessary to release the

mortgage liens CAF possessed on those CAF-financed properties

Appellants were selling to third-party homebuyers.  4-ER-652–55; 5-ER-

982; 6-ER-1064–68, 1072.  Further, the uncontroverted evidence

establishes that the release fee was a pass-through closing cost incurred

in connection with, and at the time of, Appellants' sales to homebuyers.

5-ER-982; 6-ER-1064–68, 1072.  Thus, there can be no reasonable

65

dispute that the release fee was incurred in connection with the preparation, execution, delivery, and administration of a "Loan Document"—that is, the lien release recorded on each property when an Advance was paid off.

Appellants argue that the "characterization" of the release fee as a pass-through charge is "misleading" and "unfounded" because the fee only partially covered recording fees. AOB-47. But Appellants have no evidence to rebut the fact that the release fee was a pass-through cost. Further, they have offered no legal or factual basis for limiting pass-through costs solely to recording fees and excluding the costs for preparing and tracking the instruments needed to release CAF's liens. *See* AOB-48. And Appellants cannot reasonably deny that the release fee was a closing cost. In fact, Mr. Najarian tacitly referred to it as a closing cost in his declaration. *See* 4-ER-580-¶5.

Accordingly, as the District Court correctly concluded, both the second sentence of Section 3.3 of the 2014 Promissory Notes and Section 10.8 of the 2014 Loan Agreements authorized the release fee to be charged, even if neither provision expressly referred to a "release fee." 1-ER-14–15. Indeed, this is the only conclusion one can reach without

nullifying the unambiguous phrases "all closing costs and other fees and expenses" (Section 3.3) and "all costs and expenses" (Section 10.8). California law prohibits such an interpretation. Cal. Civ. Code § 1641; *City of Atascadero*, 68 Cal. App. 4th at 473.

> c.  *Appellants' purported textual arguments do not support a finding that the release fee was not authorized.*

Appellants raise two textual arguments to try to evade their release-fee obligation. Both arguments fail.

*First*, Appellants argue that Section 3.3 of the 2014 Promissory Notes and Section 10.8 of the Loan Agreements did not authorize the release fee because those provisions referenced costs and fees "incurred by Lender" and "of Lender," respectively. AOB-40. But just as they did in the District Court, Appellants ignore the definition of "Lender" under the 2014 Loan Agreements.

As an initial matter, Appellants' argument addresses only the second sentence of Section 3.3, as the phrase "incurred by Lender" does not appear in the first sentence of that provision. 5-ER-908-§3.3, 953-§3.3. But even as to the second sentence, the argument fails.

67

The 2014 Loan Documents defined "Lender" broadly to include CAF "and its successors and assigns." 5-ER-868, 872-§1.2.5, 920, 923-§1.2.5. Consistent with this definition, the 2014 Loan Documents authorized CAF to "assign to one or more assignees all or a portion of its rights and obligations" thereunder without Appellants' consent. 5-ER-893-§9.2, 943-§9.2. It is undisputed that, in accordance with these provisions, CAF assigned certain loan-administration rights and obligations, including preparation and recordation of lien releases, to its loan servicer, Cohen. 5-ER-1042–43; 6-ER-1065–68.

Accordingly, the phrase "all closing costs and other fees and expenses incurred by Lender" in the second section of Section 3.3 of the 2014 Promissory Notes necessarily meant "all closing costs and other fees and expenses incurred by CAF and its successors and assigns," including Cohen. Likewise, the phrase "all costs and expenses of Lender" in Section 10.8 of the 2014 Loan Agreements necessarily meant "all costs and expenses of CAF and its successors and assigns," including Cohen. Any other interpretation would disregard the plain language of the 2014 Loan Documents.

Consequently, each time Cohen incurred the release fee and passed it through to Appellants, it was acting in its capacity as CAF's servicer and pursuant to CAF's express instructions—i.e., as the entity to which CAF had assigned the lien-release obligation. Absent this assignment, CAF would have had to perform the lien-servicing function itself. Accordingly, the mere fact that CAF assigned certain administrative obligations to Cohen did not somehow remove the fees associated with them from the ambit of Sections 3.3 and 10.8. Any other conclusion would mean that CAF automatically forfeited the right to receive fees otherwise authorized under the 2014 Loan Documents simply by exercising its right to utilize a servicer—an absurd interpretation to be avoided. *Eith v. Ketelhut*, 31 Cal. App. 5th 1, 19 (2018).

*Second*, relying on the six examples of closing costs set forth in the second sentence of Section 3.3, Appellants argue that the release fee is not "*e[j]usdem generis*" with those costs. AOB-42–43. But Appellants cite neither a single item of supporting evidence nor a single legal authority to support their argument, which consists largely of speculation and *ipse dixit*. AOB-42–47. Thus, the entire argument is

improper under FRAP 28(a)(8)(A) and should have no bearing on this appeal.

In any event, as explained above, the second sentence of Section 3.3 covers "all closing costs and other fees and expenses incurred by Lender," which necessarily includes the $250 release fee. 5-ER-908-§3.3, 953-§3.3. The six specific types of fees identified in Section 3.3 are—as Appellants admit—only "specific examples" of fees covered by Section 3.3, not an exhaustive list. AOB-42. And there is no dispute that the release fee covered recording fees—one of the six enumerated examples of fees covered by Section 3.3—and that the fee reimbursed Cohen for services it actually performed. 4-ER-652–55; 5-ER-982; 6-ER-1064–68, 1072. Accordingly, the unrebutted evidence directly forecloses Appellants' argument that the release fee is not of the same nature as the fee examples listed in Section 3.3.

### 2. Appellants' regular payment of the release fee confirms that the fee was authorized.

It is undisputed that Appellants paid a release fee for hundreds of Advances they received from CAF from 2014 to 2017. 6-ER-1065–68, 1161–62; 4-ER-698-¶8. Appellants made these payments after being notified of the release fee, which was expressly identified on every

payoff statement Appellants received.  5-ER-1050; 6-ER-1065–68, 1096–98; 4-ER-698-¶8.  Moreover, Appellants admit that, before filing this action, they never stated to CAF that the release fee was unauthorized, and readily obtained hundreds of new Advances from CAF despite being charged the fee.  6-ER-1161–62.  And Mr. Najarian testified that Appellants' sole complaint regarding the release fee was that it was too high and that he thought Appellants were "overpaying," not that the fee was unauthorized.  5-ER-983; *see also* 6-ER-1131–32; 5-ER-980.

These undisputed facts establish that Appellants were on notice of the release fee and regularly paid it on hundreds of Advances for nearly three years.  Thus, Appellants' course of conduct confirms that the release fee fell within the scope of Section 3.3 of the 2014 Promissory Notes and Section 10.8 of the 2014 Loan Agreement.  *See Oceanside 84, Ltd. v. Fidelity Fed. Bank*, 56 Cal. App. 4th 1441, 1443–46, 1448–51 (1997) (affirming a grant of summary judgment on a breach of contract claim where the plaintiff borrower repeatedly failed to protest the lender's method of calculating interest rates, received timely notice of those rates, and paid those rates without objection for several years).  At a minimum, Appellants' regular payment of the release fee on these

facts establishes that Appellants acquiesced in the interpretation that the release fee was authorized. *Id.* at 1450–51.

### 3. Appellants failed to proffer any admissible evidence sufficient to create a genuine issue of material fact as to CAF's authorization to charge the release fee.

In the District Court, CoreVest proffered ample evidence negating the breach element of Appellants' release-fee claim. *See* 5-ER-894-§10.8, 908-§3.3, 944-§10.8, 953-§3.3, 983; 6-ER-1131–32; 5-ER-980. This shifted the burden to Appellants to respond with specific facts, supported by admissible evidence, showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c), (e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986). Appellants plainly failed to meet their burden.

In response to CoreVest's summary judgment motion, the only evidence Appellants presented on the release-fee claim was one paragraph in Mr. Najarian's October 28, 2021 declaration and two deposition excerpts. 4-ER-580-¶5, 594–600, 612–13. This evidence did not create any genuine issues of material fact on the issue of breach.

As an initial matter, the statements in paragraph 5 of Mr. Najarian's declaration, 4-ER-580-¶5, are largely inadmissible. Mr.

Najarian has no personal knowledge of whether the release fee amount was "excessive" and offered no evidence establishing otherwise.[8]  Fed. R. Evid. 602.  Furthermore, his statement is irrelevant, Fed. R. Evid. 401–402, because as Appellants readily admit in their opening brief, their release-fee claim is premised on the allegation that the release fee was **unauthorized**, not that the amount was excessive.  AOB-47; *see* 7-ER-1279-¶¶19–22.

Moreover, Mr. Najarian's declaration testimony **supports** granting summary judgment in favor of CoreVest.  Mr. Najarian admits that he regularly authorizes his companies to pay "closing fees and costs" he believes to be excessive or unauthorized to avoid the risk of delaying or cancelling transactions.  4-ER-580-¶5.  If that is what Appellants purport to have done here, then they have admitted to having voluntarily paid the release fee despite believing it to be unauthorized, thus expressly waiving any right to challenge it.  *Cruz v. Nat'l Steel & Shipbuilding Co.*, 910 F.3d 1263, 1270 (9th Cir. 2018) ("Under California law, waiver is the intentional relinquishment of a

---

[8] CoreVest preserved its evidentiary objections to Mr. Najarian's declaration in the District Court.  4-ER-485.

known right after knowledge of the facts." (internal quotation marks omitted)).

Appellants' proffered deposition excerpts fare no better. In fact, both excerpts directly support a finding that the release fee was **_authorized_**, and that Appellants' sole complaint regarding the fee during their nearly three-year relationship with CAF was that the fee was excessive. As noted above, Mr. Najarian testified that the release fee covered the expenses for recording lien releases for CAF-financed properties that Appellants were selling, and that his sole complaint about the release fee was his belief that Appellants were "overpaying." 4-ER-595–600. Likewise, Ms. Greer's testimony confirms that the release fee covered costs Cohen incurred when "paying its employees to prepare the lien release document that needed to be filed and recorded with the county recorder's office for every property that Najarian Holdings and Najarian Capital were selling, and then . . . actually paying those recorder[s'] offices to record those lien documents." 4-ER-613. And while Ms. Greer's testimony includes a conclusory statement that the $250 **_amount_** of the release fee was "well over what

[Appellants] pay now," 4-ER-613, this has no bearing on whether CAF's release fee was authorized pursuant to the 2014 Loan Documents.

In short, Appellants offered no evidence in the District Court sufficient to create a genuine issue of material fact on the release-fee issue. Thus, the District Court's summary judgment findings on that issue were proper.

## VI. **CONCLUSION**

The foregoing analysis confirms that the District Court's entry of summary judgment in CoreVest's favor was correct on all issues before this Court. Appellants failed to satisfy their burden of creating genuine issues of material fact in opposition to CoreVest's summary judgment motion. And they failed to satisfy their burden of establishing beyond controversy every essential element of their claims in connection with their partial summary judgment motion. Accordingly, CoreVest respectfully requests that the Court affirm the District Court's final judgment and the order granting CoreVest's motion for attorneys' fees.

Dated:     August 26, 2022          Respectfully submitted,

                                    GLASER WEIL FINK HOWARD
                                      AVCHEN & SHAPIRO LLP
                                    Emil Petrossian
                                    Jason Linger


                                    By:_____/s/ Emil Petrossian_____
                                        Emil Petrossian
                                        *Attorneys for Defendant-Appellee*
                                        COREVEST AMERICAN
                                        FINANCE LENDER LLC

## <u>STATEMENT OF RELATED CASES</u>

Defendant-appellee CoreVest American Finance Lender LLC is not aware of any related cases pending in this Court.


Dated:     August 26, 2022          Respectfully submitted,

GLASER WEIL FINK HOWARD
 AVCHEN & SHAPIRO LLP
Emil Petrossian
Jason Linger


By:_____*/s/ Emil Petrossian*_____
     Emil Petrossian
     *Attorneys for Defendant-Appellee*
     COREVEST AMERICAN
     FINANCE LENDER LLC

## <u>CERTIFICATE OF COMPLIANCE</u>

I am the attorney for defendant-appellee CoreVest American Finance Lender LLC. I certify that this brief contains 13,963 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 32-1.

Dated:    August 26, 2022          Respectfully submitted,

GLASER WEIL FINK HOWARD
 AVCHEN & SHAPIRO LLP
Emil Petrossian
Jason Linger

By:_____*/s/ Emil Petrossian*_____
    Emil Petrossian
    *Attorneys for Defendant-Appellee*
    COREVEST AMERICAN
    FINANCE LENDER LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 26, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All counsel of record in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


Dated:    August 26, 2022       Respectfully submitted,

GLASER WEIL FINK HOWARD
 AVCHEN & SHAPIRO LLP
Emil Petrossian
Jason Linger


By:_____*/s/ Jason Linger*_____
    Jason Linger
    *Attorneys for Defendant-Appellee*
    COREVEST AMERICAN
    FINANCE LENDER LLC